COMMONWEALTH OF MASSACHUSETTS

WORCESTER, ss.

WORCESTER SUPERIOR COURT
C.A. No. 10-0435A

ANTHONY HAYES,
    Plaintiff

v.

P.O. DARNELL MCGEE,
P.O. JAMES O'ROURKE,
SGT. KENNETH DAVENPORT
LT. TIMOTHY O'CONNOR,
And GARY GEMME, CHIEF of POLICE
IN THEIR INDIVIDUAL CAPACITIES and
MICHAEL O'BRIEN, CITY MANAGER,
And THE CITY OF WORCESTER,
    Defendants

)
)
)
)
)
)
)
)
)
)
)
)
)
)



FILED

APR 2 9 2010

ATTEST:

CLERK

## FIRST AMENDED COMPLAINT AND REQUEST FOR JURY TRIAL

### INTRODUCTION

1.    This is an action to recover money damages for violation of plaintiff's Constitutional rights and for state torts, to wit: serious physical injury inflicted by a police officer without justification in the course of a raid on a residence on or about March 1, 2007.

### JURISDICTION

2.    This action is brought pursuant to 42 U.S.C. §§ 1983 and 1988, alleging violations of the Fourth and Fourteenth Amendments to the United States Constitution, and also pursuant to the common law of torts. This Honorable Court has concurrent jurisdiction as to the Constitutional claims, *Rzeznik v. Chief of Police of Southampton*, 374 Mass. 475, 484 n. 8 (1978); it has original jurisdiction as to tort claims. M.G.L. c. 212 §§ 3, 3A, and 4.

### PARTIES

3.    Plaintiff Anthony Hayes ("Hayes") is, and was at all material times hereto, a citizen of the United States and a resident of Worcester County, Massachusetts.

4.    Defendant Gary J. Gemme ("Gemme") was at all times material hereto the Chief of the City of Worcester Police Department ("WPD") acting under color of state law. He is being sued in his individual capacity.

5. Michael O'Brien ("O'Brien") was at all times material hereto Worcester's City manager. He is being sued in his individual capacity as a policy maker of the City.

6. Defendant Darnell McGee ("McGee") was at all times material hereto a police officer of the WPD, and he is sued in his individual capacity.

7. Defendant Kenneth Davenport ("Sgt. Davenport") was at all times material hereto a police officer of the WPD holding the rank of sergeant, and he is sued in his individual capacity.

8. Defendant James O'Rourke ("O'Rourke") was at all times material hereto a police officer of the WPD, and he is sued in his individual capacity.

9. Defendant Lt. Timothy O'Connor ("Lt. O'Connor") was at all times material hereto a police officer of the WPD holding the rank of lieutenant, and he is sued in his individual capacity.

10. Defendant City of Worcester ("the City") is a duly organized municipal corporation under the laws of the Commonwealth of Massachusetts, and at all times relevant hereto, employed the individual defendants.

11. At all times pertinent hereto the each of the individual defendants was a sworn police officer of the WPD acting under color of law pursuant to the statutes, ordinances, regulations, policies, customs, practices, and usage of the Commonwealth of Massachusetts and/or the City of Worcester.

## FACTS

12. Each of the foregoing paragraphs is incorporated as if fully set forth herein.

13. At all times pertinent hereto defendants McGee, Sgt. Davenport, O'Rourke, and Lt. O'Connor were members of the vice squad in the WPD detective division.

14. At all times material hereto, Sgt. Davenport directly supervised McGee, and Lt. O'Connor directly supervised Sgt. Davenport.

15. Defendants McGee, Sgt. Davenport, Lt. O'Connor along with detective O'Rourke contend they executed a search warrant at the residence of PT ("PT"), located at 5 Sycamore Street, Apt. 13, in Worcester, MA on March 1, 2007.

16. According to police the warrant provided for search of Hayes' room -- not PT's.

17. When the vice squad conducted the raid, the search warrant was not shown to Tenney, or to Mr. Hayes, or to another occupant of the apartment, J K ("JK").

18. Hayes and JK were in the apartment of PT, seated at a table, playing cards, when the WPD officers burst into the dwelling without notice or warning.

19. The second officer to enter the apartment at the time and place aforesaid was McGee.

20. McGee leapt over the corner of a bed and deliberately, recklessly, and maliciously struck Hayes on the left side of the head and face, while Hayes was still seated at a table with JK with his hands in full view, and notwithstanding that Hayes made no movement or utterance to suggest he would attempt to resist, impede, or harm any officer.

21. The blow delivered by defendant McGee rendered Hayes unconscious and caused physical injury.

22. When Mr. Hayes awoke, he was handcuffed and lying across the bed that Officer McGee had leapt over.

23. Tenney and Kryger witnessed McGee's assault on Hayes.

24. Tenney observed McGee strike Hayes in the head with a black flashlight.

25. At the time of Hayes' arrest McGee possessed a flashlight he had purchased himself and which he carried on duty with the knowledge of his supervisors, though it was not standard equipment the WPD issued to its officers.

26. McGee knew the object with which he struck Hayes could inflict serious bodily injury, and McGee further knew that a blow to the head with such an object could result in disfigurement, neurological injury or death.

27. At all times pertinent hereto McGee, Sgt. Davenport, Lt. O'Connor and their supervisors up the chain of command in the WPD knew that, unless a person posed an imminent threat of serious bodily harm to an officer or another person, it was unlawful for an officer to strike such person in the head with a flashlight of similar object because of the risk such action would cause serious bodily injury or death.

28. At all times pertinent hereto McGee, Sgt. Davenport, and Lt. O'Connor also knew that the WPD use of force policy prohibited strikes to the head and other high risk areas of a person who posed no imminent threat of harm to another, because of the risk of serious, disabling, or fatal injury.

29. Officers James M. O'Rourke, Darnell McGee, and Lt. Timothy J. O'Connor, all assigned to the department's vice squad, were recently targets in a highly publicized 17-month overtime investigation scandal involving the WPD.

30. Before Hayes' flashlight beating, The City, Chief Gemme, officials at the Internal Affairs Department and City Manager O'Brien knew that flashlights were being used by officers as weapons and instruments of force.

31. Nevertheless, before Hayes' arrest there were numerous incidents where WPD officers struck persons in the head with flashlights or other dangerous objects without justification.

3

32. The Internal Affairs Department of the WPD also was aware before Hayes' beating that officers would use flashlights as a striking weapon.

33. Yet before the Hayes beating and arrest, City Manager O'Brien, Chief Gemme and the WPD took no measures to ban, control, monitor or to re-train officers on risks of using flashlights as weapons.

34. In an interrogatory answered by the City in a civil rights case City Manager O'Brien signed and admitted under oath that he was aware of the following accounts or allegations involving the use of flashlights:

- A male alleged he was "hit with flashlight & Dragged"[1] (according to WPD the result of this investigation was "compliance with rule")

- A male alleged he was "punched, kneed, hit with flashlight" (according to WPD the result of this investigation was "unsustained")

- A male alleged he was "hit on head and face with flashlight" (according to WPD the result of this investigation was "unfounded")

- A male alleged he was "hit in face with flashlight, chocked" (according to WPD the result of this investigation was "unsustained")

- A citizen alleged he was "hit in head with flashlight" (according to WPD the result of this investigation was "Unfounded")

- A male alleged he was "Stuck with flashlight, punched and kicked (according to WPD the result of this investigation was "Unfounded")

- A male alleged he was "struck in the face with radio, had sidearm pointed at him" (according to WPD the result of this investigation was "Exonerated")

- A male alleged he was "Struck in chest with flashlight twice" (according to WPD the result of this investigation was "Not Sustained")

- A male and female alleged they were "Struck in the eye with flashlight." (according to WPD the result of this investigation was "Exonerated")

- A female alleged she was "Struck with flashlight, thrown to the ground, pressure point to temple area" (according to WPD the result of this investigation was "Exonerated")

- A male alleged he was "Thrown over couch, punched, kicked, elbowed, and struck with flashlight" (according to WPD the result of this investigation was "Unfounded")

---

[1] Quotations reflect how the City of Worcester characterized the complaints in answers to interrogatories signed by City Manager Michael O'Brien.

- A male alleged he was "Pushed, knee to ribs, chocked, struck with nightstick, Thrown over couch, punched, kicked, elbowed, and struck with flashlight" (according to WPD the result of this investigation was "Unfounded")

35. The City summarized these events to the Court in connection with a motion to compel and placed these responses as a public document with the court.

36. City Manager O'Brien signed this document around December 16, 2005 --before Hayes' beating.

37. At all times pertinent, McGee, Sgt. Davenport and Lt. O'Connor knew or should have known that there was no valid reason or justification for McGee to strike Hayes in the head with a flashlight or other dangerous object.

38. Hayes' arrest occurred during daylight hours in an illuminated space, and there was no legitimate need for McGee to use a flashlight at that time and place.

39. Hayes was never charged with assault, battery, resisting arrest or any other crime of violence in connection with his arrest by McGee.

40. Before Hayes' arrest, Sgt. Davenport, Lt. O'Connor, Chief Gemme and the City were all familiar with McGee's propensities for violence and excessive force when it came to raids and arrests.

41. At all times pertinent hereto Sgt. Davenport, Lt. O'Connor, Chief Gemme, and the City knew that McGee had previously been the subject of numerous complaints alleging brutality, excessive force and violation of civil rights.

42. Before March 1, 2007, Sgt. Davenport, Lt. O'Connor, Chief Gemme and the City knew McGee had been sued for injuring a man (Carlos Valencia) with a brutal flashlight blow to the head.

43. Sgt. Davenport, Lt. O'Connor, Chief Gemme and the City knew McGee had previously struck other individuals with a flashlight without legal justification.

## The Valencia incident:

44. On November 11, 1996, McGee, acting as a member of the WPD vice squad, participated in a raid at 12 Vinton Street, City of Worcester, Massachusetts.

45. A number of vice detectives and officers from the WPD participated in a raid and in the arrest of a number of individuals.

46. The officers involved in the Valencia raid included: Heriberto Arroyo[2], James Bates, Sgt. Paul Gaffney, William Lee, Christopher Murphy, Mary Killoran, David O'Rourke, Sgt. Michael Coakley, Sgt. Thomas Gaffney and Lt. Houlihan, and Detective Timothy J. O'Connor who recently retired with the rank of Lieutenant from the WPD.

47. Sgt. Gaffney was commanding officer at the scene of the 12 Vinton Street raid.

48. The Vice Squad was commanded at that time by Captain Keith D. Benway.

49. During the raid, offers rammed open the front door of a dwelling and ordered all occupants to the floor.

50. At that time and place, McGee jumped and struck Mr. Valencia in the head with a large flashlight, causing Valencia to fall to the floor bleeding profusely from a gash wound.

51. McGee or some other officer placed Valencia in handcuffs for a short period of time, but later his handcuffs were removed.

52. According to the federal complaint Valencia filed, he "was not charged with any crimes as a result of this incident." ¶ 15, *Valencia v. Darnell McGee and The City of Worcester*, United States District Court (Mass.) Docket No. 99-40018NMG.

53. At the time McGee struck Valencia with the flashlight, he and every other officer and supervisor at the scene knew that blows to the head were prohibited because of the danger of causing grievous bodily harm.

54. Valencia's wound left a pool of blood on the kitchen floor and his clothing was drenched in blood.

55. Valencia claimed in his federal civil rights complaint against McGee and Worcester that, "[T]here was no reason to strike Mr. Valencia. None of the police officers claimed there was any reason to use force on Valencia."

56. Sgt. Gaffney was aware of Valencia's injury at the time and place aforesaid because he offered Valencia a towel to stop bleeding from the head wound.

57. Because Valencia was initially handcuffed and temporarily placed under arrest, he was an "injured prisoner" within the meaning of Massachusetts General Law Chapter 276 § 33 and the policies and procedures of the WPD.

58. Because Valencia was under arrest and had a serious and unmistakable injury while "in custody," in accordance with WPD Policy and Instructions for Handling of Prisoners an "injured prisoner report" was required from a supervising sergeant.

---

[2] Heriberto Arroyo was fired by the WPD after he was indicted in federal court for drug trafficking charges and sentenced to federal penitentiary.

59.   Official incident reports were filled out by a number of police officers and detectives involved in the raid.

60.   The following detectives or officers of the WPD submitted incident reports as a result of the raid: Paul Gaffney, Sgt. Thomas J. Gaffney, Darnell McGee, Sgt. Michael Coakley, P.O David O'Rourke, William Lee, Thomas Hurley, officer Christopher Murphy, Mark Rojas and others.

61.   None of these reports listed Valencia as a person present, arrested, or injured during the raid.

62.   The only reference made regarding the presence of Valencia was made by Sgt. Gaffney who wrote in a report that when he entered the kitchen area he noticed an officer in a "struggle with two males."

63.   No injured prisoner report was ever prepared by any police officer of the WPD regarding Valencia's injuries, and Valencia was not transported to the police station.

64.   Another person arrested during the raid in which Valencia was injured also sustained serious head trauma, requiring multiple staples to suture a gash, yet no mention was ever made of this injuries or how it occurred, although one officer's CM noted in his incident report that Reyes ran and "Reyes and I began to struggle. Assistance arrived and Reyes was apprehended."

65.   The incident report prepared by officer CM noted that Reyes "requested medical treatment."

66.   Although Sgt. Gaffney acknowledged that Reyes was bleeding from the head, CM's report deliberately used vague reporting language to the effect that there had been a struggle, a chase and that Reyes had requested medical attention without explaining how Reyes sustained a large gash to his head.

67.   Valencia sued McGee and the City for violation of his civil rights.

68.   McGee never mentioned the existence of Valencia in any official report.

69.   McGee and Sgt. Gaffney falsely claimed Valencia may have hit his head against a kitchen stove, but there was no testimony to support the account of an accidental self-inflicted injury.

70.   By concocting a story of self-inflicted injury by Valencia, Vice Squad officers and their supervisors, perpetrated a fraud on the court which nonetheless failed to explain why no injured prisoner report was filed at the time of the injury.

71. Valencia's beating, the lack of investigation, and the tolerance of a contrived, belated, incomplete, and implausible explanation – all demonstrate that in November, 1996, and continuing thereafter WPD officers, supervisors and commanders in the Vice Squad observed a code of silence.

72. Valencia had to go the hospital on his own where he was diagnosed as having sustained a 10" scalp laceration, which required staples.

73. Valencia told medical staff he had been struck with an object during an encounter with police.

74. Even though Valencia filed suit on December 16, 1999 alleging McGee committed a crime, The Chief of Police at that time did not order any investigation.

75. McGee was never disciplined for beating Valencia.

76. The City of Worcester paid Valencia $25,000.00 to settle his federal civil rights lawsuit.

77. The City's failure to investigate and take corrective action against McGee and other officers involved evinced deliberate indifference to the civil rights of citizens in Worcester.

78. The City's failure to discipline McGee after the Valencia beating was the moving force behind the violation of Hayes' constitutional rights in March 2007.

**The PE incident:**

79. On August 23, 2007, the Vice Squad arrested PE.

80. One of the arresting officers was McGee.

81. PE was under police surveillance for the sale of narcotics.

82. PE was operating a motorcycle.  When a Sgt. vice detective displayed his badge and instructed PE to stop, PE ditched the motorcycle and ran on foot.

83. Vice officers chased PE on foot.

84. PE stopped running and surrendered. He also raised his hands and was tackled by a vice squad officer.

85. PE was picked up from the ground, arms held behind his back and McGee repeatedly punched in the face and eye.

86. PE was never charged with resisting arrest or for assault and battery on a police officer.

87. After McGee punched PE in the face, McGee told him "that will teach you not to run from police."

88. A vice Sgt. detective was present when McGee punched him.

89. PE continues to experience blurry vision in his eye to this date.

90. The vice Sgt. detective who chased PE on foot described PE's arrest in an application for a criminal complaint as "I observed the suspect turn in our direction to see how far behind him we were and then turn back and continue to run. Once the suspect was stopped I was informed by Officer McGee that when suspect turned back away from us he observed him throw a clear bag containing a white rock like substance."

91. This report was typical of Vice reports were force had been used: despite the fact that excessive force was used and that McGee had beaten PE despite his lack of resistance -- the arrest was described in reports in vague and generic terms.

92. The language that the Vice Sergeant used to describe the arrest failed to comply with WPD use of force policy amended in May 2007 which required that "[W]henever an arrest is made, the arrest report shall contain, at a minimum, a brief detailing any and all levels of force (i.e. Level One through Level Five inclusive) that were used on the subject. (Policy 400, paragraph X (B)).

93. The written report submitted by a Sgt. detective in the Vice-unit demonstrates the existence of a code of silence in that unit associated with the reporting of the use of force and injuries to prisoners it came in contact with.

Other City Policies linked to Hayes' injuries: OTHER COURT CASES

94. In March, 2007, the WPD had a policy regarding the handling of injured prisoners .

95. Massachusetts General Laws Chapter 276 § 33 governed the examination of injured prisoners, providing that: "Whenever a person is arrested for a crime and taken to or confined in a jail, police station or lockup, the officer in charge thereof shall immediately examine the prisoner, and if he finds any bruises, cuts or other injuries shall forthwith make a written report thereof to the Chief of Police of the town concerned…"

96. This statute is penal in nature and provides that "whoever violates this section shall be punished by a fine of not more than ten dollars."

97. On May 14, 1986, the United States First Circuit Court of Appeals upheld a federal jury verdict of $40,000.00 against Worcester for violation of civil rights, concluding the City had failed to instruct officers on the amount of force they should use in making arrests and on the need to inspect injured prisoners as required by Chapter 276 § 33. *Wierstack v. Heffernan*, 789 F.2d 968, 975 (1st. Cir. 1986).

98. In Wierstack, the plaintiff testified and claimed that after he was handcuffed he was struck by an officer "repeatedly about the head, neck and shoulder with his revolver." *Wierstack v. Heffernan*, 789 F.2d 968, 975 (1st. Cir. 1986).

99. In *Wierstack v. Heffernan*, the First Circuit noted that Chief of Police for the WPD "blatantly admitted that he would not have wanted Officer Heffernan to have included in his arrest report the fact that he had struck the plaintiff three or four times." Id.

100. His testimony evinced a code of silence promoted within the highest levels of the WPD in May of 1986 and continuing.

101. Despite that ruling in 1986, the City and its policymakers did little to correct the problems identified by the *Wierstack* Court.

102. On August 19, 1986, Ronal C. Madnick, Executive Director of the Worcester Chapter of the American Civil Liberties Union ("ACLU") appeared before the City Council and requested that the Wierstack decision be referred to the Public Safety Committee of the City Council to look into issues of police training , discipline and supervision.

103. His request was marked in the City Council's agenda in ¶ 83.

104. Contemporaneous audio records of that City Council meeting demonstrate that during that meeting Acting Chief of Police Thomas L. Leahy, Jr., and former City Manager Mulford were present.

105. After Mr. Madnick made his request to the Council, Mr. Madnick saw and heard Chief Leahy round up City Councilors and admonish them that any referral of police policies and procedures to the Public Safety Committee of the Council would be considered a vote of no confidence in his administration and in the police department.

106. Members of the City Council praised the Chief, the WPD – the progress made since that Court case and rejected any request to re-examine WPD policies and procedures.

107. An article published by Telegram & Gazette reporter John J. Monahan on August 25, 1986 corroborates that the City Council agreed with Chief Leahy and voted unanimously to reject the ACLU's request.

108. Since 1987, Mr. Madnick as a representative of the ACLU, prepared a bounded report entitled "Worcester Police Department Procedures 1987."

109. In this report the ACLU addressed concerns and made recommendations regarding a number of topics, including "injuries to prisoners", "suicide prevention", "high-speed pursuits", strip searches among others.

110. In May 1992 the ACLU prepared another report entitled "Report on the Worcester Police Department" in May 1992.

111. This report was hand-delivered to then City Manager Jeffrey Mulford and to then Chief of Police Edward Gardella.

112. The forty-five (45) page report detailed a variety of citizen complaints who claimed they had been abused and victimized by members of the WPD.

113. The report addressed the following concerns: "prisoner's restrained in cells", denial of medical care and treatment of pregnant women", "racial incidents", "officers failing to identify themselves", "officers using unnecessary force", and "use of handcuffs to punish prisoners."

114. Neither the City Manager nor the WPD made any efforts to contact the ACLU to find out additional information on the complaints outlined in its report.

115. One of the complaints given to the City Manager and the Chief involved a citizen by the name of "TB". TB alleged a person had been chocked, punched and hit over the head with a flashlight a number of times. That person alleged he had medical records from City Hospital to show he had a "broken bone in my face."

116. Sometime around December 7, 2005 the ACLU director met with Chief Gemme to discuss a number of incidents involving the WPD.

117. Mr. Madnick discussed with the Chief a number of concerns the ACLU had regarding various areas of law enforcement including but not limited to, "access to [internal affairs] complaint forms", "investigatory procedures by the WPD", the lack of an "Early Warning System" to track complaints, "Adrenaline Rush", "Injuries in cells", deficiencies with "Injury Reports", "Civil Lawsuits", "Training and Supervision", "Use of Force Policy" and how they should result in automatic investigations and "Code of Silence".

118. Gemme ignored the ACLU's allegations.

119. Gemme did not investigate the ACLU's allegations.

The allowance of filing false reports throughout the WPD creates a climate that encourages lack of accountability and fosters a code of silence.

120. At the time of Hayes' arrest, the WPD also had a "Truthfulness in reporting" policy requirement which applied to officers' submissions to the police department in any of their official reports.

121. Policy 1402.1 specifically provided that "an officer or employee of the Department shall truthfully state facts in all reports as well as when he appears before or participates in any judicial, Departmental or other official investigation, hearing trial or proceeding. He shall fully cooperate in all phases of such investigations, hearings, trials and proceedings."

122. Dept. veterans McGee, Sgt. Davenport, O'Rourke and Lt. O'Connor knew of this policy.

123. Furthermore, when McGee, Sgt. Davenport and Lt. O'Connor placed Mr. Hayes under arrest, they knew that filing a false police report was a crime.

124. All of the aforesaid officers knew that under General Law Chapter 268 § 6A, that "whoever, being an officer or employee of the Commonwealth or of any political subdivisions thereof or of any authority created by the general court, in the course of his official duties, files or publishes any false written report, minutes or statement, knowing the same to be false in a material matter, shall be punished by a fine of not more than one thousand dollars or by imprisonment for not more than one year, or by both such fine and imprisonment."

125. Sgt. Davenport had an opportunity and an obligation to examine Mr. Hayes for injuries as required by G. L. c. 276 Section 33.

126. Sgt. Davenport falsely reported that: "Mr. Hayes was standing between the table and a bed. At that time Vice Detectives took Mr. Hayes to the floor in an effort to secure him. While being placed on the floor Mr. Hayes may have struck his head on the frame of the bed. Mr. Hayes was then secured without further incident."

127. Sgt. Davenport filed a false report, because he saw McGee strike Hayes.

128. At the time of Hayes' arrest, Sgt. Davenport was responsible for preparing an "injured prisoner report" regarding Hayes and for disseminating it up the chain of command, first to his immediate supervisor, Lt. O'Connor.

129. Lt. O'Connor was in turn responsible for reviewing Sgt. Davenport's report, making any corrections necessary, signing and submitting the report to *his* superiors.

130. Lt. O'Connor, who witnessed McGee's assault on Hayes, knew that critical information in Sgt. Davenport's injured prisoner report was false.

131. Notwithstanding its falsity, Lt. O'Connor signed the injured prisoner report regarding Hayes and submitted it up the chain of command to the following individuals, Capt. Steven Sargent, Deputy Superintendent Giulio Fusaro and ultimately to Chief Gemme, each of whom was responsible for reviewing that report.

132. At the time of Hayes' arrest, a number of officers who participated in the raid prepared incident reports.

133. Sgt. Davenport deliberately failed to mention in his report how Hayes was injured or what level of force was used on Hayes.

134. Sgt. Davenport only noted that he and other officers warned Hayes and others in the room "POLICE, SEARCH WARRANT," and described the arrest as uneventful.

135. Sgt. Davenport did not state in his report that Hayes was belligerent or that Hayes resisted.

136. McGee prepared an incident report on the arrest, omitting any reference to force used, injury or resistance.

137. McGee submitted his incident report up the chain of command, i.e., to Sgt. Davenport, and to Lt. O'Connor, each of whom was responsible to review and (if they found the report to be proper) to endorse it.

138. McGee lied in his report by stating that once officer Davenport announced "Police, Search Warrant," "immediately upon entry a male later identified as Anthony Hayes attempted to exited (sic) the room while discarding evidence."

139. Despite having knowledge as to the falsity of this statement, Sgt. Davenport and Lt. O'Connor signed and/or endorsed McGee's false report and distributed it to other supervisors up the chain of command.

140. Instead of admonishing McGee about the level of force to be used prior to the raid, or intervening or immediately disciplining McGee after his encounter with Hayes, Sgt. Davenport and Lt. O'Connor ratified, condoned and encouraged McGee's conduct and deception by endorsing a false report.

141. It was custom and practice among certain officers and their superiors -- and it was certainly McGee's practice -- to allow the use of vague and terms in reports, such as describing subjects' attempting to "flee" "struggle" or to "exit" or to "discard evidence."

142. These terms were coded police language used by McGee and others to hide the use of excessive force during arrests.

143. This practice was frequently condoned by some supervisors who knew the meaning of these terms but did nothing to stop the practice.

144. Sgt. Davenport's and Lt. O'Connor' failure to control and/or supervise McGee demonstrates the existence of a code of silence in the WPD on March 1, 2007.

## Other WPD Supervisory Policies that fostered a code of silence:

145. The code of silence was fostered by a number of existing policies within the City of Worcester and the WPD.

146. At the time of Hayes' arrest, the City of Worcester, and its Chief of Police had knowledge of the existence of an unconstitutional policy, dating back to the early 1980s, associated with the reporting and documentation of the use of force by its officers.

147. Chief Gemme became interim Chief of Police in the fall of 2004.

148. As such, he was the policymaker for the entire WPD.

149. City Manager Michael O'Brien was at all time pertinent hereto designated by the City Charter the "conservator of the peace" and had ultimate responsibility for the ultimate firing and disciplining of police officers.

150. Chief Gemme also had responsibility for disciplining and dismissing officers at the time of Hayes' arrest.

151. City Manager O'Brien, from before Hayes' arrest to the present time, had a custom and practice of not reviewing or being involved in certain disciplinary actions against WPD officers when the time of suspension was five days or less.

152. This *de facto* policy followed by City Manager O'Brien by Worcester, prevented Mr. O'Brien from learning about potentially serious or sensitive cases involving allegations of police misconduct in which the length of suspension did not exceed a five day period.

## USE OF FORCE REPORTS AND A DE FACTO POLICY IN THE WPD THAT FAILED TO REQUIRE OFFICERS TO PREPARE THEM

153. At the time of Hayes' arrest, the City of Worcester, and its policymaker, Chief Gemme believed that Worcester's use of force policies required officers to explain uses of force in written reports only in instances where they used weapons specifically issued to them by the WPD, but this was not the case.

154. At the time of Hayes' beating the WPD "use of force" policy existed as policy # 400 and had been effective since September 1, 1993.

155. The 1993 WPD policy described use of force as, force including deadly, non-deadly, "such as the use of hands, handcuffs or other restraining devices, chemical substances, agents or similar devices or instruments for the emission of gas, and police or riot batons or firearms."

156. This policy only permitted use of force "reasonably necessary to effect lawful objectives and effectively bring an incident under control."

157. The WPD use of force policy that applied to Hayes' arrest required at Section 14 that: "[T]he officer shall prepare and submit all required reports. If more than one officer is involved in a use of force incident resulting in an injury, each officer shall complete a report outlining his actions and observations in the incident.

158. Moreover, the policy that applied to Hayes' arrest required "A detailed description of the circumstances that led up and required the use of force."

159. It also required a "detailed description of the actual use of force."

160. Thus, if hands, kicks or any force at all was used by a WPD officer, he/she was required to account for it in a use of force report.

161. The policy provided also that if an injury or complaint of pain exists, supervisors are encouraged to obtain photographs. A photograph showing no injury may be as important as one which shows injury.

162. Finally, the 1993 use of force policy provided that "for every incident where an officer applies force through the use of a weapon, his report, which is required under Section 14, shall be reviewed by his Commanding Officer who shall forward the report together with his findings as to whether the incident violated policy and procedure."

163. At the time of Hayes' arrest Worcester officers were not required by Chief Gemme or by supervisors to file use of force reports when the only force used involved hands, feet or some other method of force.

164. At the time of Hayes' arrest, there was a *de facto* policy that required officers to prepare a use of force reports only when their actions involved the use of a relatively few departmental issued weapons such as the use of a batons, chemical sprays, or firearms.

165. A "use of force report" was an official report distinct from an officer's incident report.

166. At the time of Hayes' arrest, writing a use of force report required an officer to describe the type of weapon used, and elaborate on circumstances of its use, that is, to explain how and why the officer was compelled to use the weapon.

167. A use of force report, like the injured prisoner report, would be disseminated and reviewed up the chain of command until it reached the chief.

168. Each supervisor in the chain of command who received a subordinate's use of force report was responsible to review it for completeness to sign it and distribute it to his or her superiors.

169. At the time of Hayes' arrest, Chief Gemme was the ultimate recipient and custodian of these records.

170. Without requiring officers to submit use of force reports every time its officers used force (regardless of the types of implements used), it was not possible for Chief Gemme or the City to monitor and assess officers' uses of force to determine if they were proper and lawful.

171. At the time of Hayes' arrest, Worcester did not have a system of quality control, in accordance with accepted police practices and procedures that provided for the effective monitoring and oversight of the use of force by its officers.

172. The failure to have such system amounted to reckless and deliberate indifference to the rights of citizens.

173. This was particularly important when the level of force used by officers involved the use of hands, feet, or other equipment, such as flashlights.

174. At the time of Hayes' arrest, because flashlights were not listed as departmental issued equipment, an officer was not required to report the use of such equipment as a weapon or in a use of force report.

175. At the time of Hayes' arrest, if a Worcester officer punched, slapped, kicked or injured a citizen with his hands or feet (justifiably or not), that officer was not required to document or describe the type of force used in the incident report, nor was the officer required to file any use of force report – even when injuries resulted –even when its own policy required it.

176. This grossly negligent and reckless *de facto* policy allowed and encouraged officers to use vague and generic terms in their reports such as "mild resistance" or "struggle" or "violent resistance" without disclosing or explaining their actions during the arrest.

177. This *de facto* use of force policy in existence at the time of Hayes' arrest permitted officers to employ force as they saw fit knowing full well they would not be called to account for injuries to citizens particularly the force involved, hands, feet, the use of non departmental instruments or WPD issued equipment not enumerated in the use of force policy (e.g. such as police radios).

178. By maintaining the aforesaid policy Chief Gemme and the City failed to monitor and control the use of force to assure that it would be used no more often, and to no greater degree, than was necessary and lawful.

179. Worcester's unconstitutional use of force policy at the time of Hayes' arrest prevented Worcester and police supervisors from evaluating what force was actually used by field officers and assess whether those uses of force were reasonable.

180. This unconstitutional policy effectively allowed officers to operate in the field with little supervision and without effective monitoring.

181. This policy was in whole or in part the moving force behind the violations of Hayes' constitutional rights.

182. Worcester changed its use of force policy on April 13, 2007, a little over a month after Hayes' beating.

183.   Yet Worcester and Chief Gemme were on notice long before Hayes' beating of WPD's deficient use of force policy as actually applied.

184.   On April 13, 2007, Chief Gemme promulgated Policy 400, which amended the 1993 previous policy.

185.   The new policy provided that "[R]egardless of whether the subject was arrested, whenever force is used on a Level III or above (A subject who actively resists), all incident and/or arrest reports shall contain, at a minimum, a brief detailing any and all force that was used on the subject."

186.   This new policy also provided that "[W]henever an arrest is made, the arrest report shall contain, at a minimum, a brief detailing any and all levels of force (i.e. Level One through Level Five inclusive) that were used on the subject.[3] (Policy 400, paragraph X (B)).

## The Hayes Raid:

187.   No one in Ms. Tenney's apartment was Mirandized or shown a search warrant despite Sgt. Davenport's assertions that they were, before Darnell McGee assaulted Mr. Hayes.

188.   Hayes and Kryger were seated when McGee knocked Hayes unconscious.

189.   Prior to the raid, Hayes was uninjured.

190.   Hayes was brought to the booking room of the Worcester Police Department at 1:44 p.m and processed.

191.   At the time of Hayes' arrest the booking officer was required to obtain basic information from him.

192.   At the beginning of the booking it was apparent that Hayes was visibly injured and disoriented.

193.   The booking officer asked Hayes if he had just been "shoot[ing] up," which he denied.

194.   Hayes replied "I just got hit in the face with a flashlight."

195.   The booking officer asked Hayes, "Who did that?" and Hayes replied the cop that came today.

196.   The booking officer told Hayes he would go to the hospital.

---

[3] Level One involves the "compliant subject", Level two, "The Resistant (Passive) Subject", Level three "The Resistant (Active Subject)", Level Four "The Assaultive (Bodily Harm) Subject" and Level five "The Assaultive (Serious Bodily Harm, Death) Subject.

197.   The WPD policy for handling injured prisoners as applied was not used to check or to monitor the type of injuries that prisoners developed when they came in contact with police

198.   Under WPD policy 700 which dealt with "Instructions for Handling Prisoners" the booking officer, was required to inquire of Hayes: 1) how his injury occurred, 2) if it was received before, during or after the arrest, 3) the type and extent of injuries, 4) treatment received and by whom.

199.   WPD policy 700 provided, "If the allegations are made that the injury was caused by a police action, that the officer's Commanding officer has been so notified in order that reports can be immediately filed."

200.   A review of the WPD booking records shows no record of any contact made with a commanding officer in order to file reports.

201.   Despite the fact that Hayes told the booking officer that he was assaulted by police with a flashlight, this information did not trigger any kind of internal investigation or review, even though the booking officer ordered Hayes be transported from the police station UMass. Memorial Medical Center for medical treatment.

202.   Because Hayes was transported in a WPD transport wagon to UMass. Memorial Medical Center, his transportation for medical care was reflected in the WPD daily log.

203.   Because Hayes was accompanied by police officers to UMass. Memorial Medical Center, police learned from hospital staff that Hayes had suffered facial fractures.

204.   The WPD daily log prepared by the booking officer -- Officer Trotta-- reflected that Hayes was "injured during the arrest."

205.   When Hayes was released from UMass Memorial Medical Center WPD personnel knew he had sustained multiple facial fractures.

Worcester lacked a critical incident policy

206.   The circumstances of Hayes arrest, involved a critical police incident, given the severe nature of Hayes' injuries.

207.   Hayes' arrest was a "critical incident"; he was initially uninjured, he was assaulted by an officer with a weapon without legitimate purpose, and he was seriously injured.

208.   Departments the size of Worcester's Police Department and smaller had at the time of Hayes' arrest, policies and procedures to investigate critical police incidents such as this one.

209. Critical incident policies would require a department to have mechanism to initiate an internal investigation as soon as a citizen complained to the police, even if it is done verbally.

210. There are a number of reasons why the Hayes arrest did not generate an internal investigation by Worcester police.

211. The Chief, the City and its police department, made it difficult for citizens that complained about police abuse to file complaints against officers, requiring a complaining citizen to go to the police department and file an internal affairs written complaint.

212. Despite employing close to 400 officers, the Worcester PD still lacks a website that would permit citizens to file electronic complaints against officers.

213. More important, Worcester lacked a policy that would require automatic investigation of critical incidents.

214. Policymakers within the WPD, including Chief Gemme and previous Chiefs were all aware that a policy was needed that would require investigations of alleged police abuse.

215. On March 22, 2005 Gary Gemme wrote to the City Council to explain how the department tracked injured prisoner reports.

216. On March 22, 2005, Chief Gemme told the Council:

   • That the service division tracked injured prisoner reports;

   • That his department required "injured prisoner reports to be forwarded to internal affairs";

   • That, if a citizen claimed that he/she had an injury caused by an officer, that officer's commanding officer would be notified to look into it;

217. But the Chief didn't tell the City Council that:

   • internal affairs would never review or critically question injured prisoner reports it received through interdepartmental channels -- unless the injured citizen also filed a complaint in writing to internal affairs or to the police;

   • That internal affairs would not conduct audits of its injured prisoner reports to find out the prevalence of injuries (e.g. or the seriousness of injuries, or whether the injuries occurred as a result of systemic deficiencies in training by officers, or whether they occurred in particular divisions or among certain officers);

   • Commanding officers, even when notified of injuries allegedly caused by their

subordinate officers, would not investigate or inquire in any way into the circumstances of those injuries.

218. At the time of Hayes' arrest, Worcester lacked a computer database tracking citizen complaints, e.g. an early warning or intervention system for problem officers who were repeatedly the subject of citizen complaints.

219. The City of Worcester knew as early as 1999 that such system was needed in order to properly monitor and track citizen complaints, but instead of implementing such a system, Worcester made excuses to justify delay.

220. An early warning system implemented before Hayes' arrest would have given the City and Chief Gemme additional information about prior incidents of misconduct involving McGee and the need for prompt intervention and discipline.

221. Worcester's and Gemme's failure to implement an early warning system identifying problem officers such as McGee, was a moving force behind the violation of Hayes' constitutional rights.

The injuries sustained by Hayes:

222. Mr. Hayes was transported by a wagon to UMass Memorial Medical Center hospital and reported to ED physician Dr. Gould and other health care personnel that "The police kicked my door in and beat my face."

223. Dr. Gould diagnosed Hayes with "reported assault and multiple facial fractures."

224. A computed assisted tomography (CT Scan) of Mr. Hayes head revealed he has suffered a minimally displaced fracture at the anterior wall of the right maxillary sinus, and a probable fracture at the posterior wall of the right maxillary sinus.

225. The CT Scan also showed a severely comminuted fracture at the anterior and the posterior wall of the left maxillary sinus. The CT scan also noted air tracking into the left pterygopalatine fossa and the medial aspect of the left mandible from left maxillary sinus fracture.

226. Hayes' CT Scan reading also revealed soft tissue swelling in both cheeks and frontal head, left greater than right.

227. Hayes CT scan also showed a non-displaced fracture of the left lateral wall of the orbit present.

228. A CT scan of the maxillofacial region also showed diastasis of the left zygomatic or frontal suture.

229. Mr. Hayes' fractured facial bones required two surgeries by Worcester plastic surgeon Douglas Rothkopf, M.D., F.A.A.C.P.

230. Dr. Rothkopf had to rebuild fractured bones in Mr. Hayes collapsed face.

231. On March 14, 2007 Dr. Rothkopf performed an open reduction with internal fixation of the left zygomatic complex fracture, with insertion of synthetic implant in facial bone.

232. As a direct result of McGee's blow to the face, Hayes zygoma was depressed 10 mm.

233. Photos of Mr. Hayes' face post-surgery are attached as **Exhibit** 1.

234. Mr. Hayes' injuries were caused by the actions of McGee, Sgt. Davenport, Lt. O'Connor, Chief Gemme and the City of Worcester.

<u>The Internal Affairs Investigation and Worcester's failure to conduct thorough and objective investigations:</u>

235. On October 17, 2007 Hayes counsel served upon City Manager Michael O'Brien and Chief Gemme, Notice and Presentment of Hayes potential claims against the City under the Massachusetts Tort Claims Act.

236. The City Manager acknowledged receipt of the claim.

237. Because of the previously described systemic deficiencies in the policies and procedures of the WPD, Worcester although aware of Hayes' injuries, did little to investigate the beating or to discipline those responsible for the violation of his rights.

238. Hayes was interviewed by WPD internal affairs investigators on April 6, 2009.

239. Hayes told investigators from the Bureau of Professional Standards, it was impossible that his left side head injury was caused by the bed frame, because the bed had been on his right, between him and the front door through which the police raid occurred.

240. Hayes explained to internal affairs personnel that the vice squad burst through the only door of the apartment (i.e. there was no other way out of the apartment), and that he was still seated when he was struck and rendered unconscious.

241. The recording of that interview makes it clear that the Bureau of Professional Standards interviewers saw the interview as an opportunity to discredit Hayes' account from the beginning, as opposed to finding the facts of the case – it was more cross examination than interview.

242. In fact, in the Bureau of Professional Standards investigations, the line of questioning and the tenor of the questions is always different when lawyers are involved as opposed to when the complainant attends without a lawyer or the prospect of litigation.

243. When the Bureau of Professional Standards is aware that lawyers are involved, or the risk of litigation exists, its "investigators" go out of their way to find in favor of the officers being investigated, even when the evidence favors the complaining citizen.

244. When the nature of a complaint does not pose a risk of litigation, or involves minor complaints of discourtesy and foul or abusive language, the BPS takes a more evenhanded approach.

245. The tone of the questions that Hayes was asked make it clear that the investigators were not interested in hearing Mr. Hayes' recitation of events.

246. Upon information and belief, the City has not made any efforts to contact medical personnel to verify Hayes' allegations, which is typical of most investigations.

247. According to Hayes, the WPD never attempted to communicate to him the results of the investigation into the McGee event.

248. Hayes counsel has on numerous occasions by telephone requested the results or conclusions of any WPD investigation, with no response.

249. On August 17, 2009 Chief Gemme notified Mr. Hayes in writing that after investigating his allegations: "It has been determined that your complaint is not sustained, i.e. there is no sufficient evidence to either prove or disprove the allegation."

250. An examination of Bureau of Professional Standards' investigations into federal civil rights claims, reveals a number of deficiencies in the investigations:

- The Bureau of Professional Standards rarely contacts doctors who treated the complaining witness as part of their investigation;
- Investigators frequently fail to track down and talk to percipient witnesses who have information about the events surrounding the injury;

- Complaining witnesses are grilled with direct questions at the police station which are calculated to discredit the witnesses' story (e.g. for bias);

- Conversely, the involved police officers are sent an Inter-Departmental Form, which presents the officer with some simple written questions for him/her to answer;

- Typically officers return the forms, saying they do not remember the events;

- the Bureau rarely follows up with the officer to confront them with contradictory evidence from booking tapes, photographs, medical records, or witnesses

- Creating an exceedingly high and impermissible standard of proof that has never been required by other professional police departments in order to sustain citizen complaints.

- Worcester has a policy of not investigating state or federal civil rights complaints against a WPD officer that alleges abuse <u>unless</u> the citizen also files a complaint with the internal affairs department.

251.   Worcester's BPS investigators looking into circumstances likely to result in litigation usually offer conclusions of "the more likely scenario" explanation for the injury – e.g. citizen x was more likely injured by hitting his head on object y.

252.   Finally, Gemme and Worcester do not investigate incidents of alleged abuse, even where Court orders or Judgments from State or Federal Courts are critical of the actions of the WPD officers.

<u>Other Instances of Police Misconduct by Lt. Timothy O'Connor – the Altagracia incident- and Worcester's refusal to accept criticism from any Court of Competent Jurisdiction creates the impression that department is above the law</u>

253.   At the time of Hayes' arrest, policy makers of the City and the Police Department, including Gemme, were aware that on more than one occasion, evidence in a criminal case was suppressed by a Worcester Superior Court because the Court did not believe Lt. O'Connor's testimony, when O'Connor claimed he gave an arrestee Miranda warnings.

254.   Specifically, on August 29, 2003, Superior Court Judge Ralph Gants wrote: "After careful consideration, this Court has come to the conclusion that Sgt. O'Connor intended to lie to the Court by falsely fabricating consent to enter the apartment to avoid the legal difficulties of justifying the entry without such consent." **Exhibit** 2, p. 6.

255.   Judge Gants wrote "in view of this finding, this Court directs the District Attorney to provide a copy of this decision to the Chief of the Worcester Police Department so that consideration can be given to whether disciplinary action against Sgt. O'Connor is appropriate." Id. at fn. 2 p. 6.

256.   Judge Gants wrote a thorough six-part analysis explaining why he did not believe Lt. O'Connor's sworn testimony about getting permission to search the premises. **Exhibit** 2 at pp. 5-10.

257.   When the Massachusetts Appeals Court backed Judge Gants 'ruling asserting that Lt. O'Connor had intended to lie, Chief Gemme, who served as a Captain in the Vice Squad when the motion to suppress was decided, stated that Lt. O'Connor had his full support. (Source, Telegram & Gazette Article Gary V. Murray, August 1, 2008).

258. At the time of Hayes' arrest, policy makers of the City and the Police Department, including Chief Gemme, were also aware that Lt. O'Connor and members of the vice squad had been found in another instance by Judge Agnes, to have violated constitutional protections, writing: "[E]very person in this Commonwealth has an interest in insuring that the police observe the limits imposed by our state and federal constitutions and laws. In this case, those limits were not observed." Exhibit 3.

259. Judge Agnes refused to believe testimony of Lt. O'Connor that a criminal defendant had been read Miranda rights in that case.

260. Judge Agnes refused to believe testimony of Lt. O'Connor that a criminal defendant had admitted he was in possession of a large quantity of drugs in his home in that case.

261. It is alleged that at the time of Hayes' arrest, policy makers of the City and the Police Department, including Chief Gemme were aware that several members of the vice squad had allegedly submitted false police reports or had failed to correct erroneous information in reports of other vice squad members.

262. On December 2, 2008, The Telegram and Gazette reported that Police Chief Gemme had recommended the termination of Lt. O'Connor.

263. From March 19, 1999 to the present the Worcester Police Department has lacked a policy requiring discipline of a police officer adjudicated by a state or federal court to have violated the civil rights of citizens.

264. The United States First Circuit Court of Appeals has held that municipalities as well as individual police officers may be held liable under section 1983 where deficiencies in supervision or training cause violations of civil rights.

265. On April 30, 1996, the United States First Circuit Court of Appeals, in the case of *Joseph Consolo v. George, et. al.*, held that two WPD officers had been deliberately indifferent to the medical needs of an arrested citizen and assessed damages against them in the amount of $90,000.00 as a result of their failure to allow prompt access to medical care.

266. Not one of the officers implicated in the suit by Joseph Consolo was ever disciplined, sanctioned, or reprimanded as a result of the arrest and maltreatment of Mr. Consolo.

267. In *Jaroszuk v. City of Worcester*, et al. Worcester Superior Court, CA No. 02-0293A, Mr. Kevin Jaroszuk alleged he sustained six broken ribs as a result of being thrown into a toilet, while restrained in handcuffs, and none of the officers who interacted with Mr. Jaroszuk was ever disciplined.

268.   In *Charles Evangelista v. City of Worcester, Shane Marcotte, Jason Fanion, Daniel Fallon, II, Jonathan Cotter, James Johnson, Carl Supernor U.S. District Court 05-10311MLW,* ("Evangelista") was dragged by officers through the hallways of the police station and beaten and kicked, resulting in the rupture of Mr. Evangelista's bladder, and none of the officers who interacted with Mr. Evangelista was ever disciplined.

269.   Evangelista claimed that the dragging and beating was caught on tape.

270.   He also alleged that one of the officers reviewed the tape of the beating and after viewing the tape he then "caused the videotape of the Evangelista booking to be erased in its entirety." Complaint ¶ 25.

271.   Instead of investigating the allegations by Evangelista, Chief Gemme told Reporter Scott Croteau of the Telegram & Gazette, "I have absolute faith in the officers and supervisors who were at the scene that day…", "I do support the officers but I also respect the City's decision based on risk assessment." (Source Telegram & Gazette, October 27, 2006).

272.   Chief Gemme also concluded that "When you buy into risk assessment you have to say you are willing to absorb some costs."

273.   Chief Gemme told reporters that the videotape system used during the Evangelista booking "erased accidentally" because the officers working the system that night were "fairly new at it."

274.   The Chief did not investigate or ask that WPD personnel investigate the circumstances of the Evangelista beating.

275.   Gemme agreed with the City's decision to pay Charles Evangelista $250,000.00.

276.   In *Daniel Houde v. Robert Turgeon, Stephen Gunnerson, Kevin Johanson, Matthew D'Andrea, Brian Halloran, Thomas Duffy, Sean McCann and the City of Worcester, U.S District Court, District of Massachusetts CA No. 05-40075FDS,* Mr. Houde claimed in his federal complaint that he was beaten by this group officers.

277.   He claimed that on May 20, 2002, police broke into the back of his car, while some officers went to the front and he was beaten ferociously "about the head and the face without any warning or provocation. The officers used their fists, their shod feet and flashlights during the beating until Houde was no longer conscious."

278.   Houde filed a federal civil rights action in May 17, 2005 at the same time that Gemme was serving as Chief of Police.

279.   The complaint alleged "Houde was unarmed. Yet, all of the named defendant police officers participated in the beating, and dragged Mr. Houde's body from his vehicle. Id. at ¶ 50.[4]

---

[4] According to the complaint none of the officers involved in the Houde arrest suffered any injuries. Id. at paragraph

280. In Houde's case none of the officers who assaulted with him were ever investigated or disciplined, even though Houde was diagnosed with nine (9) bilateral facial fractures. Complaint at ¶ 57.

281. Instead of investigating the allegations by Mr. Houde Chief Gemme told Telegram & Gazette Reporter Lee Hammel on February 18, 2008 that "The police used reasonable and necessary force to effect the arrest" of a suspect who was violently resisting and assaulted the arresting officer and back up officers."

282. Chief Gemme added that the officers acted "properly and with restraint" and that prompt medical attention and procedures were followed including those requiring when a suspect is injured or equipment such as pepper spray is used."

283. Chief Gemme failed to tell the Telegram & Gazette why his department failed to investigate the allegations that flashlights, shod feet, and fists, had been used to strike Houde repeatedly, and failed to investigate it as a critical incident because of serious nature of the injuries.

284. Federal Judge F. Dennis Saylor, Jr. wrote on September 30, 2007 in an opinion denying summary judgment to the City of Worcester and various WPD officers on the excessive use of force claim that he saw "disturbingly graphic photographs showing severe facial swelling and bruising, blurry vision, abrasions on his arms and legs and a laceration to above his left eye."

285. In denying the City's motion Judge Saylor stated "What began as a traffic stop for a minor violation rapidly escalated into a physical altercation, in which Houde was severely beaten and sustained substantial physical injuries. Viewed from the standpoint of an objectively reasonable officer, Houde's resistance to defendants' efforts to handcuff him may not have warranted such an extreme response. A reasonable officer may not have believed that defendants' conduct was appropriate. Under the circumstances, defendants are not entitled to qualified immunity."

286. Chief Gemme told the Telegram & Gazette there was no investigation of the Houde incident because Houde "did not file a complaint with the department."

287. No investigation was ordered by Gemme, O'Brien or the City into Houde's federal complaint allegations, which evinced a reckless disregard amounting to deliberate indifference to the rights of its citizens.

288. In Houde, in Evangelista, and in other cases, the Chief, Michael O'Brien and the City have chosen to ignore the circumstances of the beatings.

289. The City agreed to pay Houde $100,000.

54.

290.  In recent years the number of citizens who sustain facial fractures when arrested by Worcester Police has increased.

291.  Although Chief Gemme and the City are aware of these cases, they have failed to start their own investigation into them or to ascertain why these cases are happening with such frequency and severity.

John Doe 1

292.  On March 20, 2007, John Doe 1 had his head smashed into a building wall before being kicked in the ribs when he fell.

293.  Doe 1 had to be taken to UMass with myriad facial injuries, and blood spatters on the wall of the building against which he was slammed were clearly visible after the fact.

294.  Doe 1 was charged with an open container, resisting and disturbing the peace

295.  It should have been clear to the person that booked him that he had just been beaten by an officer, but on information and belief, no inquiry was made.

296.  Doe 1's medical records show "diagnosis of Assault, R Frontal Sinus FX and R Maxillary Sinus FX."

John Doe 2

297.  On September 24, 2003, Doe 2 was pulled from the vehicle, thrown to the ground, and then kicked in the head by a number of Worcester police.

298.  As he was beaten, Doe 2 heard one of the officers yell "cameras," when a Telegram & Gazette reporter arrived on scene with his camera.

299.  In photographs, Doe 2 can be seen bleeding and handcuffed on the pavement, adjacent to the truck's passenger door, from which he was pulled.

300.  One Worcester officer involved in that arrest said he had used a palm heel strike.

301.  At the U Mass Memorial hospital, while still in custody, Doe 2 was told his eyesockets had been broken.

302.  Doe 2 told Emergency Room doctor that his face looked the way it did because the police had beat him up.

303.  No WPD officer or supervisor asked this ER doctor how Doe 2 had suffered his facial fractures.

304. Doe 2 had suffered small blowout fractures of the inferior and medial walls of left orbit with associated mild clouding of a number of ethmoid aircells.

305. Worcester police were present when health care personnel told Doe 2 he had suffered facial fractures, but none of the WPD reports mentioned facial fractures, instead using euphemistic words such as "facial contusions".

John Doe 3

306. On March 9, 2008, John Doe 3 was struck to the left facial area with a closed fist, when the officer perceived "Doe 3 appeared to raise his left arm toward me."

307. Due to "left facial swelling", Doe 3 was brought to Memorial Hospital for treatment (per cellroom dept policy).

308. Doe 3 was charged with B+E, malicious destruction of property, larceny and resisting arrest.

309. Doe 3 was diagnosed with "several broken bones in left side of face" "Amb. to ED stating WPD "beat me up".

310. Doe 3 was sent home with facial fractures instructions and "it is really important that you follow up with plastic surgery and opthomology (sic)."

311. Doe 3 had "1) comminuted left orbital floor and lateral wall fractures with herniation of orbital fat into the left maxillary sinus; 2) comminuted fractures of the walls of the left maxillary sinus, without evidence of zygomatic arch or pterygoid plate fracture."

John Doe 4

312. On June 27, 2009, John Doe 4 was struck in the face with a closed fist and smashed against a wall.

313. The incident report prepared by the Worcester police officer makes no mention of hitting the suspect.

314. UMass Memorial records reflect a July 2, 2009 CAT scan and evaluation by opthamology.

315. Doe 4 had suffered a "depressed left frontal sinus fracture of the anterior wall, nondisplaced fractures of both zygomatic arches and both lateral orbital walls…We did discuss the option of possible surgical repair of the anterior wall of the frontal sinus with plates and screws…"

316. Doe 4 was given contact information for follow up with a plastic surgeon.

John Doe 5

317.   On July 10, 2009, John Doe 5 was viciously punched and kicked in the head, and his head slammed into a wall, causing him to bleed from his eye.

318.   When Doe 5 asked to be taken to the hospital he was told to shut the fuck up, and taken to the police station for three hours before the police noticed Doe 5 was severely injured.

319.   Doe 5 told a booking officer he had been beaten and the officer told Doe 5 he must have resisted arrest.

320.   Doe 5 was booked and not provided medical care, but it should have been clear to the person that booked him that he had just been beaten by an officer.

321.   His medical records show he sustained an orbital fracture.

### The Case of Michael Melendez

322.   Lt. O'Connor was sued in 1991 on allegations that he violated the civil rights of a citizen. Michael Melendez, Maria Melendez, Diana Melendez, Raymond Zayas and Isaac Ortiz. U.S. District Court –Massachusetts 91-40174XX.

323.   The complaint alleged that Sgt. O'Connor and others came out of from behind the counter of the waiting area at the WPD and that then Sgt. O'Connor grabbed Ms. Melendez from behind, pulled her across the room and "repeatedly slammed her against a nearby wall, pushing his knee against her stomach." Complaint at ¶ 31.

324.   The complaint also alleges that "Sergeant O'Connor kicked Maria Melendez between the legs and kicked her legs out from under her so that she fell to the floor. Id. at 32.

325.   The Complaint also alleges that when Sgt. O'Connor and another officer were transporting Ms. Melendez to the booking room and Ms. Melendez complained that the handcuffs were too tight that "Sergeant O'Connor tightened the cuffs." Id ¶ 48.

326.   The complaint alleges that when she was booked she complained to the booking officer about what Sgt. O'Connor had done to her. Id. paragraph 52.

327.   Upon information and belief, Sgt. O'Connor was never disciplined as a result of the allegations made in this federal complaint.

328.   On or about March 21, 1995, the City and Mr. Melendez lawyer's filed a settlement order with the United States District Court.

COUNT 1
42 U.S.C. § 1983/Monell
ALL DEFENDANTS

329. Each of the foregoing paragraphs is incorporated as if fully set forth herein.

330. Defendant McGee put plaintiff in harm's way and demonstrated behavior that was reckless, callous and deliberately indifferent to Mr. Hayes' safety.

331. By its longstanding policy of not investigating critical incidents and not disciplining officers when citizens are injured, defendant Worcester and Chief Gemme and Mayor O'Brien condoned defendant McGees's misconduct, led defendant McGee to believe he would not be held to account for his actions, and put plaintiff in harm's way.

332. Worcester and the WPD have consistently condoned dangerous behavior that is reckless, callous and deliberately indifferent to citizen health and safety.

333. Mr. Hayes' safety was compromised knowingly, intentionally, willfully, purposely, maliciously and with such reckless disregard of the consequences as to display a conscious indifference to the danger of harm to him.

334. As a direct and proximate result of the foregoing, Mr. Hayes was deprived of his rights under the Constitution and caused great pain of body and mind.

COUNT 2
NEGLIGENCE, M.G.L. c. 258
CITY OF WORCESTER

335. Each of the foregoing paragraphs is incorporated as if fully set forth herein.

336. On or about August 16, 2007 plaintiff's counsel gave notice and presentment to Gary Gemme, Chief of Police and Captain John Harrington of the Internal Affairs Department in accordance with the Massachusetts Tort Claims Act. M.G.L c. 258 et seq.

337. Plaintiff complied with all conditions precedent and the recipients failed to respond with an offer of settlement within the sixth month time period required by state law.

338. As a direct and proximate result of the negligence of the defendants, Mr. Hayes suffered severe emotional distress, great pain of body and mind.

COUNT 3
CONSPIRACY
Defendants Darnell McGee, James O'Rourke, Kenneth Davenport and Timothy O'Connor

339. The plaintiff incorporates the above paragraphs by reference into this count as if fully set forth herein.

30

340. These Defendants did conspire to hide McGee's flashlight knockout of Anthony Hayes.

## COUNT 4
## ASSAULT AND BATTERY
### Defendant Darnell McGee

341. The plaintiff incorporates the above paragraphs by reference into this count.

342. Defendant McGee committed the common law torts of assault and battery against the plaintiff.

343. As a direct and proximate result thereof, the plaintiff suffered the injuries described above.

## COUNT 5
## SUPERVISORY LIABILITY
### Defendants Gemme, O'Connor, O'Brien and Davenport

344. The plaintiffs incorporate the above paragraphs by reference into this count.

345. These defendants were both responsible for appointing (hiring), training, disciplining, firing and supervising Defendant McGee.

346. Each deliberately or recklessly and sanctioned, allowed, and condoned acts of misconduct to occur, including acts of excessive use of force, and denial of access to medical care.

347. Each by their acts and omissions adopted, continued and perpetuated the policies and practices of their predecessors in failing to monitor, control and remediate excessive and unnecessary use of force by Worcester police officers and otherwise disregarding the civil rights of citizens who come into contact with said officers by failing to appropriately hire, train, monitor, investigate, discipline or dismiss officers of their respective departments as alleged herein.

348. By the same actions described above, these defendants deprived the plaintiffs of clearly established and well settled rights under the Constitution of the United States including the rights under the First, Fourth and Fourteenth Amendments.

349. These defendants acted with reckless disregard for the plaintiffs' constitutional rights.

350. Their actions, inactions, or omissions were the moving force behind plaintiffs' injuries.

351. As a direct and proximate result of the conduct, plaintiff was harmed as described above.

## COUNT 6
### MASSACHUSETTS CIVIL RIGHTS ACT, M.G.L. c. 112 § 11IM
#### Defendants McGee, Davenport, O'Connor and O'Rourke

352.   The plaintiff incorporates the above paragraphs by reference into this count as if fully set forth herein.

353.   These Defendants deprived the plaintiff of his rights under federal and state law by threats, intimidation and coercion, thereby violating the Massachusetts Civil Rights Act.

354.   As a direct and proximate result of the aforesaid unlawful conduct, the plaintiff suffered the injuries described herein.

## COUNT 7
### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
#### DARNELL MCGEE

355.   Plaintiff repeats and reavers all of the allegations contained from Paragraph 1 through 352 as if expressly rewritten and set forth herein.

356.   The conduct of McGee constituted intentional infliction of emotional distress.

357.   By his actions, defendant McGee subjected the plaintiff to reprehensible conduct knowingly, intentionally, willfully, purposely, maliciously and with such reckless disregard of the consequences as to display a conscious indifference to the danger of harm and injury.

358.   As a direct result of the intentional conduct of the defendants in this count, Mr. Hayes suffered severe emotional distress and great pain of body and mind.

### DEMANDS FOR RELIEF

The Plaintiff hereby respectfully requests the following relief:

1.   All compensatory damages recoverable;
2.   Injunctive relief;
3.   All punitive damages recoverable;
4.   All attorney's fees, costs and expenses allowable;
5.   Any and all other relief as the Court deems just and proper;
6.   That defendants be found joint and severally liable

### PLAINTIFF DEMANDS A JURY TRIAL AS TO ALL COUNTS IN THE COMPLAINT

Respectfully submitted,
Plaintiff ANTHONY HAYES
By his attorneys,

Hector E. Pineiro, BBO # 555315
Robert H. Beadel, BBO # 632447
807 Main Street
Worcester, MA 01610
Tel. (508) 770-0600

Dated: April 27, 2010

A true copy by photostatic process
Attest
Asst. Clerk

## CERTIFICATE OF SERVICE

I, Robert Beadel, do hereby certify that no party has yet been served in this action, and therefore, there is not yet any attorney or party to serve with this motion.

DATED: 4/27/10

Robert H. Beadel

EXHIBIT 1











**EXHIBIT 2**

# COMMONWEALTH OF MASSACHUSETTS

WORCESTER, ss.

SUPERIOR COURT
CRIMINAL ACTION
NO. 02-1767 & 1768

## COMMONWEALTH OF MASSACHUSETTS,

vs.

## MAXIMINIA ALTAGRACIA and ISIDRO ARIAS,
Defendants

## FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER ON DEFENDANTS' MOTIONS TO SUPPRESS

The defendants, Maximinia Altagracia ("Altagracia") and Isidro Arias ("Arias"), have moved to suppress any and all evidence resulting from the search of their home at 138 Endicott Street, Apartment 1, in Worcester and from the interrogation that occurred immediately prior to and during this search. An evidentiary hearing was conducted on this motion over three days — July 15, 2003, July 28, 2003, and August 1, 2003 — at which six witnesses testified. For the reasons detailed below, the defendants' motion to suppress is **ALLOWED IN PART AND DENIED IN PART**.

## FINDINGS OF FACT

Officer Richard Burgos of the Worcester Police Department had a confidential informant ("CI") whose information had proved reliable in the past and led to narcotics arrests and the confiscation of narcotics on at least five prior occasions. This CI told Officer Burgos that drugs were being sold from the first floor apartment at 138 Endicott Street in Worcester by a Hispanic male in his late forties, with a dark complexion, medium build, and short hair. The CI said that this drug dealer used a Ford Escort for delivering the narcotics, and provided Officer Burgos with



the license plate number. The CI had made two drug buys from this drug dealer at his first floor apartment at 138 Endicott Street while Officer Burgos conducted a physical surveillance of this address, the most recent being roughly two weeks before April 11, 2002. On two occasions in the months before April 11, Officer Burgos followed the Hispanic male described by the CI as he left 138 Endicott Street, entered the Ford Escort with his wife, and drove to different locations to meet with people in his car in what appeared to drug transactions.

At some time prior to April 11, 2002, the CI had agreed to make a controlled buy of narcotics from this individual at 138 Endicott Street on April 11. The plan of the Vice Squad, of which Officer Burgos was a member, was to follow the controlled buy with a search of Apartment 1 at 138 Endicott Street. In keeping with this plan, the Vice Squad, led by Sgt. Timothy O'Connor, was mobilized to conduct a physical surveillance of this location on the morning of April 11 to await the controlled buy and then conduct the search of the apartment.

Officer Burgos arrived in the Honey Farms parking lot behind 138 Endicott Street before 8 a.m. to await his CI; other Vice Squad officers arrived at their locations for the physical surveillance between 8 a.m. and 9 a.m. The CI, however, never showed up; nor did the CI call Officer Burgos that morning.

At roughly 10:30 a.m., Officer Burgos observed Arias, who fit the description provided by the CI, leave 138 Endicott Street and come out to the Ford Escort identified by the CI. While Arias was outside, a grey Ford Lumina arrived in front of 138 Endicott Street and the vehicle's passenger, later identified as Michael Legor, left the vehicle, spoke briefly with Arias, and followed Arias inside 138 Endicott Street. The driver of the vehicle drove the Lumina around the corner to Vernon Street and parked it there, even though there were available parking spaces on

Endicott Street.   Roughly one minute later, Legor left 138 Endicott Street, walked around the corner to Vernon Street, and entered the Lumina, which then drove away.   Another Vice Squad officer involved in the physical surveillance, Officer Larry Williams, recognized Legor and knew him to be a heroin addict.   He radioed his fellow Vice Squad officers that he knew Legor and was going to follow him.   Two unmarked police cruisers went in pursuit of the Lumina – the vehicle with Officer Williams and his partner, Officer Bates, and another vehicle driven by Officer James O'Rourke.   Officer Williams waited until the Lumina was near the Rice Square School, roughly two miles away from 138 Endicott Street, before he turned on the blue lights and stopped the Lumina.

Officers Williams and Bates searched and questioned Legor, while Officer O'Rourke searched and questioned the driver, George Fayard.   Legor had no drugs on his person, but admitted to Officer Williams that he had just purchased heroin from 138 Endicott Street.   Officer O'Rourke found a small green vial containing roughly one gram of heroin in Fayard's pocket. Both Legor and Fayard were placed under arrest. When Officer Williams informed Sgt. O'Connor by radio that they had found heroin on Fayard, Sgt. O'Connor arrived at the arrest location and conferred with the arresting officers.   There, Sgt. O'Connor made the decision that they would enter and search 138 Endicott Street, Apartment 1.   Sgt. O'Connor's plan was to arrange for a uniformed officer to knock on the door of the apartment and tell Arias that there was an accident involving his Ford Escort.   Once this ruse succeeded in getting Arias out of the apartment, the Vice Squad officers were to enter the open door and secure the apartment through a protective sweep.   Sgt. O'Connor radioed for a uniformed police officer to meet him at the parking lot of the Vernon Medical Center, which was a short distance from 138 Endicott Street.

3

At this parking lot, Sgt. O'Connor met with Officer O'Rourke and the uniformed officer, Officer Kenneth Kozak, and explained the plan to them. He communicated the plan to the other Vice Squad officers via radio.

Meanwhile, Officer Williams waited near the Rice Square School for the patrol wagon to take Legor and Fayard to the police station for booking. When the patrol wagon arrived roughly fifteen minutes later, he told the wagon officers to attempt to stall Legor and Fayard from making any telephone call in the booking area. Their cell phones had been confiscated at the time of their arrest, so their first opportunity to make a telephone call would have been at the pay telephone in the booking area.

The uniformed officer (Officer Kozak) carried out the ruse, and it worked as planned. Arias left the apartment voluntarily with Officer Kozak to look at his car and, once he left the apartment, he was confronted outside by Sgt. O'Connor while other Vice Squad officers entered the open door and conducted a protective sweep. Altagracia had been in her nightgown in the bedroom, and was brought to the kitchen table. Sgt. O'Connor and two other officers escorted Arias into the apartment, and he joined Altagracia at the kitchen table.

Officer Burgos was the only fluent Spanish-speaker in the Vice Squad who was at or around 138 Endicott Street, and he was summoned to Apartment 1 to serve as the interpreter for Sgt. O'Connor's interrogation of Arias and Altagracia.[1] When he arrived, Sgt. O'Connor and Officer O'Rourke, as well as other members of the Vice Squad, were already inside. Sgt. O'Connor directed Officer Burgos to give Arias and Altagracia their Miranda rights, and Officer

---

[1]      Officer Williams is also fluent in Spanish but he was not yet there, having waiting for the patrol wagon to pick up Legor and Fayard.

Burgos advised them of their rights in Spanish.  He asked if they understood their rights, and they said they did.  He explained that they were there because drugs were being sold from their apartment, and they had found drugs on a white male who had just left the apartment.  Meanwhile, Officer Williams entered the apartment and remarked on the bottle of Inositol that was in plain view in the kitchen.  Arias, in Spanish, explained that he used it for body building.  Officer Burgos asked Arias for consent to search the apartment.  Arias initially said they could search but, when Officer Burgos asked him to sign a consent form, Arias refused to sign anything and quickly revoked his consent.  Sgt. O'Connor then said they would not search without an executed consent form, and directed Officer Williams to obtain a search warrant for the apartment.

The Vice Squad officers waited in the apartment with Arias and Altagracia for roughly 1 ½ - 1 3/4 hours, when Officer Williams returned with the search warrant.  They then executed the search warrant, finding the heroin, currency, and drug paraphernalia that is the subject of this motion to suppress.  While they waited for the warrant, Officer Burgos spoke in Spanish with both Arias and Altagracia.

## CONCLUSIONS OF LAW

I will address each of the defendants' suppression claims in turn.

1. ### Was the Vice Squad's Initial Entry into the Apartment Lawful?

   a. ### Did Arias Consent to this Initial Entry?

Sgt. O'Connor testified that Arias consented to the police entry into Apartment 1 when he confronted Arias after the uniformed officer had persuaded Arias to leave the apartment through the ruse.  According to Sgt. O'Connor, once Arias was outside the apartment, he approached

Arias, introduced himself, and advised him of his Miranda rights in English. (Sgt. O'Connor does not speak Spanish.) Arias answered, "yes," to the question of whether he understood his rights. Sgt. O'Connor said that he explained to Arias that the police had observed a drug transaction at his residence that morning, that both of the individuals involved were under arrest, that both were found with heroin, and that both said they had bought it from him. Arias denied knowing anything about these individuals. He asked Arias if there were any other drugs in the apartment, and Arias said there was not. He asked Arias if there was anyone still in the apartment, and Arias said that his wife was there. He asked Arias if they could go inside to look for drugs, and Arias said that they could. It was then that Sgt. O'Connor told the other officers to enter the apartment. He instructed them to secure the apartment but not to search it. He then entered the apartment with Arias.

This Court does not believe this testimony. After careful consideration, this Court has come to the conclusion that Sgt. O'Connor intended to lie to the Court by falsely fabricating consent to enter the apartment to avoid the legal difficulties of justifying the entry without such consent. This Court, as noted in the Findings of Fact above, finds that officers from the Vice Squad entered Arias's apartment to conduct a protective sweep as soon as Arias left the apartment through the ruse and was confronted by Sgt. O'Connor, and that Arias did not consent to this initial entry.[2]

This Court has reached this conclusion for at least six reasons. First, Sgt. O'Connor

---

[2]      In view of this finding, this Court directs the District Attorney to provide a copy of this decision to the Chief of the Worcester Police Department so that consideration can be given to whether disciplinary action against Sgt. O'Connor is appropriate. Of course, the District Attorney is responsible to determine whether these facts warrant a perjury investigation.

testified that, before the ruse was implemented, he had already decided that they would enter the apartment, secure it, and later search it, regardless of whether or not Arias gave his consent. Since he had not yet sent anyone to obtain a search warrant, this means that he did not believe that he needed Arias's consent to justify the initial entry and the protective sweep.  It is not credible that he would postpone the initial entry into the apartment in the hope of procuring a consent that he did not believe legally he needed, when doing so would have risked warning anyone else in the apartment that the police were present outside.[3]

Second, Officer O'Rourke testified that Sgt. O'Connor spoke with him and the uniformed officer at the Vernon Medical Center parking lot about the ruse minutes before it was implemented, and nothing Sgt. O'Connor said indicated that the entry into the apartment was to await the receipt of consent by Arias.  Rather, the plan was to bring Arias out of the apartment through the ruse, take him into custody, enter the apartment through the unlocked door that Arias had just exited, and secure the apartment. There was nothing said about waiting for Arias's consent before the officers were to enter the apartment.  Officer O'Rourke also was present when the ruse was implemented and the entry accomplished.  He testified that Officer Lombardi was the first officer to enter the apartment, and that he entered, at most, one minute after Arias had left the apartment through the ruse.  It would have taken much more than one minute for Sgt. O'Connor to have had the discussion he described with Arias that preceded the purported consent to enter.  Officer O'Rourke also did not testify that Sgt. O'Connor informed Officer Lombardi of Arias's consent before Officer Lombardi entered; if Officer Lombardi's entry was to await such

---

[3]     Sgt. O'Connor testified that he knew before the ruse that Arias lived at the apartment with his wife.

7

consent, Sgt. O'Connor would have needed to communicate that consent to Officer Lombardi and Officer O'Rourke would likely have heard it communicated.

Third, Sgt. O'Connor testified that, once he obtained the consent, he told other officers to go inside and he quickly followed them inside with Arias. However, by the time he arrived, Altagracia was already seated at the kitchen table, having been pulled from her bed, where she had been when the police first arrived. This means that, by the time Sgt. O'Connor had arrived, the protective sweep had already been completed and Altagracia had been roused from her bed and seated at the kitchen table. If Sgt. O'Connell had waited for Arias's consent to enter before the police commenced the protective sweep, and then promptly followed up on the consent by entering the apartment with Arias, as he testified, there would not have been sufficient time for the sweep to be completed and for Altagracia to be brought to the kitchen before Sgt. O'Connor's arrival. If the protective sweep, however, had commenced when Sgt. O'Connor first confronted Arias, there would have been enough time for the sweep to have been completed and for Altagracia to be brought into the kitchen prior to Sgt. O'Connell's arrival.

Fourth, if Sgt. O'Connor had truly obtained Arias's consent to go inside the apartment and look for drugs, as he testified, the police would have commenced their search of the premises, and not limited their efforts to a protective sweep. Sgt. O'Connor admitted that he did not, as a matter of practice, always require a written consent form to be signed before commencing a search if oral consent had been given. If he had oral consent, there is no reason why he would have delayed the search in order to obtain written consent. Indeed, neither Arias nor Altagracia were asked to sign a Miranda card after they had been given their Miranda rights at the apartment, but Sgt. O'Connor certainly did not delay obtaining admissions from either

8

Arias or Altragracia before obtaining a written waiver of their Miranda rights.

Fifth, Sgt. O'Connor did not prepare a police report regarding the events that occurred on April 11, 2002. He testified that it was his practice to prepare a police report only when he had important information that no other police officer on his squad had knowledge of and could include in their own report. Since no other police officer was present when Sgt. O'Connor spoke with Arias and purportedly gave his consent to enter the apartment to look for drugs, one would certainly expect that Sgt. O'Connor, in keeping with his practice, would have prepared a report memorializing that discussion and that consent. The absence of any such report suggests that no such consent was given. The explanation that Sgt. O'Connor offered at the hearing – that he did not think Arias's consent to enter the apartment was important enough to require a police report – is simply not credible.

Sixth, Sgt. O'Connor testified that Arias spoke in complete sentences in English when he answered the questions that were posed to him by Sgt. O'Connor in English. This Court is persuaded by the testimony offered by Arias's friends, Kenia Camacho and Milagros Alicier, both of whom testified that Arias spoke no English, that Arias did not know enough English to speak in complete English sentences.[4] Sgt. O'Connor also testified that, since Arias had no difficulty speaking English, he used Officer Burgos to translate only for Altragracia, not for Arias. Officer Burgos, however, testified that he served as Sgt. O'Connor's translator with both Arias and Altagracia. Officer O'Rourke also testified that Officer Burgos served as the

---

[4]     It is difficult for this Court to determine whether Arias spoke any English, since the only time that either Camacho or Alicier were with Arias when English was spoken to him was when Arias was conferring with his attorney or Altagracia's attorney. However, this Court is convinced that, even if Arias understood some English and spoke some English, he did not know enough English to speak consistently in complete English sentences.

9

interpreter whenever Sgt. O'Connor spoke with Arias in the apartment.

Consequently, this Court finds that Arias did not, in fact, consent to the Vice Squad's initial entry into Apartment 1. This Court must then consider whether there was any other basis, apart from consent, to justify this initial entry and protective sweep.

b.   **Was the Initial Entry and Protective Sweep Justified by Exigent Circumstances?**

The Commonwealth contends that, even without consent, the police were justified in entering Apartment 1, conducting a protective sweep, and securing it while they waited for a search warrant because of the risk that contraband or evidence would be destroyed or removed if they delayed. According to the Commonwealth, the exigency that justified entering and securing Apartment 1 was the risk that Legor or Fayard would telephone Arias (or telephone someone else who would, in turn, telephone Arias), and inform him of their arrest following Legor's purchase of heroin from Arias (and possibly of Legor's admission to the police that he had just purchased heroin from Arias). Such a telephone call, contends the Commonwealth, would tip off Arias to the likelihood of an imminent search of his home, and pose a substantial risk that Arias would destroy or remove any contraband or evidence from his home before a search warrant could be obtained and the search executed.

In Commonwealth v. DeJesus, the Supreme Judicial Court declared:

> We now hold that police officers who secure a dwelling while a warrant is being sought in order to prevent destruction or removal of evidence may not enter that dwelling, in the absence of specific information supporting an objectively reasonable belief that evidence will indeed be removed or destroyed unless preventative measures are taken.

439 Mass. 616, 621 (2003). While the Court declared that, for purposes of deciding the DeJesus case, it "need not determine with precision the minimum requirements that would justify such an

entry," id. at 623, its rejection of the Commonwealth's claim of exigency in that case makes it clear that it would also reject the Commonwealth's claim of exigency in the instant case.

In DeJesus, an undercover police officer purchased 300 grams of cocaine from an individual named Rocky Graciano as the defendant sat in the car that Graciano used to deliver the cocaine. Id. at 617. Both the defendant and Graciano were arrested immediately following the undercover drug purchase. Id. After his arrest, Graciano agreed to cooperate with the police, and told them that the defendant was his supplier and had provided Graciano with the cocaine that he had sold to the undercover officer. Id. at 617-618. As a result of the information provided by Graciano, the police considered applying for a search warrant for the defendant's residence but were not sure which apartment in the three-decker where he lived was his. Id. at 618. The police, therefore, used a key that was taken from the defendant at the time of his arrest to open the door of the apartment that Graciano thought belonged to the defendant. Id. The key worked, and the officers entered the apartment and conducted a protective sweep to see if anyone was inside. Id. Finding the apartment empty, the police observed cocaine and cocaine packaging equipment in plain view on the kitchen table before they left to prepare the search warrant application. Id.

The DeJesus Court found that the facts in that case were plainly inadequate to demonstrate the exigency needed to justify a warrantless entry to secure the apartment while awaiting receipt of the search warrant. Id. at 623. The Court declared:

> The Commonwealth asserts that the risk that others knew of the defendant's arrest and that one or more individuals inside his apartment might have removed or destroyed evidence before a warrant issued justified the officers' limited search of the premises for occupants. Adoption of this reasoning, however, would allow police officers to enter a suspect's home every time an arrest is made, so long as police have probable cause to

11

believe that evidence might be found therein.  There always will be a possibility that a confederate of the arrestee might destroy or conceal evidence.  We decline to hold that an arrest on the street, without more, can provide its own justification for a warrantless entry and search, albeit a limited one, of a dwelling.

Id. at 622-623.

The Commonwealth's justification for the warrantless entry is weaker here than it was in DeJesus.  In DeJesus, it was a resident of the apartment who was arrested; here, it was two individuals who did not live in the residence, and whose relationship to Arias was believed simply to be that of a narcotics purchaser.  In DeJesus, a state trooper prior to the warrantless entry had overheard a woman in Graciano's apartment tell an unknown caller that Graciano had been arrested.  Id. at 619.  Here, there was no information that anyone other than Legor and Fayard knew of their arrest.  Here, the police feared that Legor or Fayard may telephone Arias and tip him off about their arrest, but the evidence was clear that such a call could only be made by them from the pay telephone in the booking area.  Officer Williams had asked the patrol wagon officer to delay their use of this telephone.  Even if they made a telephone call from this pay telephone, in view of its location near the booking desk, it would be easy for the police to overhear what Legor or Fayard said.  Consequently, if Legor or Fayard were going to tip off Arias about their arrest and warn him of a search, the police would have had the opportunity then to enter and secure the apartment.  See Commonwealth v. Forde, 367 Mass. 798, 801 (1975) (arrestee's statement to compatriots to warn occupants of his apartment could supply exigent circumstances permitting warrantless entry of apartment).  Finally, in DeJesus, the police needed to use the key in order to confirm that the apartment they planned to search belonged to the defendant.  Here, the police had not even begun to prepare the search warrant affidavit when they

12

entered the defendants' residence.

Nor can the Commonwealth justify the warrantless entry by claiming that, once they arrested Arias outside the apartment, they feared that Altagracia would destroy contraband and evidence. The police chose to use a ruse to cause Arias to leave the apartment so they could arrest him, and thereby created the exigency. They could surely have applied for a search warrant promptly after the arrest of Legor and Fayard, and postponed Arias's arrest until the commencement of that search. See Commonwealth v. Forde, 367 Mass. at 803 ("where the exigency is reasonably foreseeable and the police offer no justifiable excuse for their prior delay in obtaining a warrant, the exigency exception to the warrant requirement is not open to them"). See also Niro v. United States, 388 F.2d 535, 540 (1st Cir. 1968) (haste does not become necessary when the need for it is brought about by deliberate and unreasonable delay by the police). For all these reasons, this Court finds that there was not "specific information supporting an objectively reasonable belief that evidence will indeed be removed or destroyed unless preventative measures are taken" that justified the warrantless entry and protective sweep of Apartment 1. See Commonwealth v. DeJesus, 439 Mass. at 621.

This Court's conclusion that the initial entry and protective sweep of Apartment 1 was unlawful does not automatically require the exclusion of evidence discovered during this entry and sweep; it simply requires the suppression of the fruits of this unlawful conduct. Id. at 624. An illegal "entry would not be a basis to suppress evidence subsequently obtained unless there is a showing that the evidence sought to be suppressed is an exploitation of the prior illegality." Commonwealth v. Blake, 413 Mass. 823, 830 (1992). In the context of this case, that means, at a minimum, that this Court must suppress any statements that were made by the defendants and

13

any observations made by the police during the time period from the initial entry into the apartment until Officer Williams returned to the apartment with the signed search warrant.

It also means that this Court must evaluate whether there was probable cause to obtain the search warrant after excising from Officer Williams' affidavit all references to observations that were made by the police following their entry into the defendants' apartment.[5] Specifically, that means that this Court must exclude from Officer Williams' affidavit the information regarding (1) the observation of the Inositol bottle and the Proctor-Silex grinder on the kitchen shelves, and (2) the observation of "cut-corner" baggies in the toilet, and evaluate whether the balance of the affidavit provides probable cause to believe that contraband or other evidence of drug dealing will be found in Apartment 1.

Once this information is excised, the affidavit contains the following information:

- a description of Officer Williams' training and experience in the investigation of narcotics crimes;

- that Officer Burgos had a confidential informant ("CI") who "had provided information in the past which has proven to be reliable and true, and has lead to the seizure of drugs and money resulting in arrests for drug violations;"

- that the CI had told Officer Burgos "over the last several days" that the CI had been buying heroin from a Hispanic male in the first floor apartment of 138 Endicott Street;

- that the CI said that this male uses a grey Ford Escort to make heroin deliveries;

- that earlier on the morning of April 11, 2002 (the date Officer Williams sought and

---

[5]     The affidavit did not refer to any statement made by the defendants to the police, so there is no need to excise any such information.

14

obtained the search warrant), Officer Williams and other Vice Squad officers conducted a physical surveillance of 138 Endicott Street;

- that during the course of that surveillance, at around 10:30 a.m., a Hispanic male walked out of 138 Endicott Street and entered and exited the grey Ford Escort parked outside multiple times;

- that the Hispanic male then stood outside 138 Endicott Street, as if waiting for someone to arrive, and a Lumina with two white males, Legor and Fayard, stopped in front of 138 Endicott Street;

- that Legor, who was known by the police to be "heroin dependent," left the vehicle, spoke briefly with the Hispanic male, entered 138 Endicott Street with him, and left a few minutes later;

- Fayard, who was driving the Lumina, did not wait for Legor in front of 138 Endicott Street but instead parked the car on Vernon Street;

- based on these observations, viewed in the light of Officer Williams' training and experience, he believed that Legor went to 138 Endicott Street to purchase heroin; and

- the Lumina was later stopped and, quoting from the affidavit, "Officers did discover heroin in there [sic] possession."

The defendants contend that the quotation in this last-bullet point should also be excised from the affidavit since it was false and was intended to deceive the Magistrate into believing that heroin was found on the person of both Legor and Fayard, rather than Fayard alone. Under Franks v. Delaware, if the defendant can show by a preponderance of the evidence that an affiant's assertion in an affidavit was false and was made by the affiant with knowledge of its

falsity or in reckless disregard of the truth, the Court must excise the false statement from the affidavit and determine whether the balance of the affidavit establishes probable cause. 438 U.S. 154 (1978). Officer Williams testified that this assertion was not false because he believed that both Legor and Fayard jointly possessed the heroin found on Fayard's person. This Court finds that, at best, this assertion was ambiguous and, at worst, it was deceptive. Based on the evidence presented in the affidavit, it was reasonable for the Magistrate reviewing the affidavit to understand that heroin was found on Legor's person. If it had been made clear in the affidavit that heroin was found only on Fayard's person, it would have raised a question as to whether it was reasonable to infer that Legor had indeed purchased heroin minutes earlier from the Hispanic male at 138 Endicott Street.

This Court, however, need not make a finding as to Officer Williams' intent in choosing this language to characterize what the police found when they stopped Legor and Fayard, and searched their persons. The reason is that, even if this Court were to redact the information in the last bullet point and consider only the information in the remaining bullet points or were to substitute the true information for the misleading information – that is, treat the affidavit as if it made clear that heroin was found on Fayard's person but not on Legor's person -- this Court still concludes that there was probable cause to search the defendants' apartment.

Even with this redaction or correction, the affidavit still included information that a CI, who had proven reliable in the past, had firsthand knowledge of Apartment 1 at 138 Endicott Street being used for drug dealing because he had been buying heroin from that apartment. The CI also identified the car used to make drug deliveries. The CI's information had been corroborated that morning by the observations of the officers conducting the physical

16

surveillance of 138 Endicott Street, who observed Arias entering and exiting the car identified by the CI and engaging in conduct with a known heroin addict that was consistent with a retail narcotics sale. The information provided by the CI, strengthened by the corroboration arising from the physical surveillance of 138 Endicott Street, was sufficient to support a finding of probable cause.  See generally Commonwealth v. Upton, 394 Mass. 363, 376 (1985); Commonwealth v. Welch, 420 Mass. 646, 651 (1995). While information confirming that Legor had heroin in his possession immediately after this visit would have strengthened this probable cause, it was not necessary to a finding of probable cause.  Nor would probable cause have been vitiated if the affidavit had made clear that heroin was found on Fayard's person, but not on Legor's.

The defendant argues, correctly, that there can be no finding of probable cause as to the search warrant without sufficient facts demonstrating the reliability of the CI.  The defendant contends that the information provided in Officer Williams' affidavit is inadequate to demonstrate the CI's reliability because it indicates that the CI's information was used to make drug arrests, but is silent as to whether any of these arrests resulted in convictions.  This Court acknowledges that the fact that a confidential informant's information resulted in arrests alone does not establish the informant's veracity.  See Commonwealth v. Mejia, 411 Mass. 108, 112 (1991); Commonwealth v. Amral, 407 Mass. 511, 515 (1990).  However, Officer Williams' affidavit also declared that the CI's information "has lead to the seizure of drugs," and this additional information has been found sufficient to establish an informant's veracity.  See Commonwealth v. Mejia, 411 Mass. at 112-113 (inclusion of information regarding seizure of narcotics was "critical distinction" between that affidavit and one which declares simply that the

17

informant's information lead simply to arrests); <u>Commonwealth</u> v. <u>Perez-Baez</u>, 410 Mass. 43, 46

(1991).

   Since this Court finds that the search warrant obtained by Officer Williams was supported

by probable cause, this Court denies the motion to suppress the contraband and evidence found

when that search warrant was executed.  Considering this ruling in the context of this Court's

earlier ruling, the Commonwealth may not offer into evidence any statement made by the

defendants in the apartment prior to the arrival of the search warrant, since these statements were

the fruit of the illegal initial entry.[6]  Nor may the Commonwealth offer into evidence any

observation made by the police officers inside the apartment prior to the arrival of the search

warrant, since these, too, are fruits of the illegal entry.  The Commonwealth may offer into

evidence the contraband and evidence found during the execution of the search warrant, as well

as any observations made by the officers during the execution of that warrant.

<u>ORDER</u>

   For the reasons detailed above, this Court hereby <u>**ORDERS**</u> that:

1. The defendants' motion to suppress is <u>**ALLOWED**</u> to the extent that any statements that

were made by the defendants and any observations made by the police during the time

period from the initial entry into the apartment until Officer Williams returned to the

apartment with the signed search warrant are hereby suppressed; and

2. The defendants' motion to suppress is <u>**DENIED**</u> to the extent that the Commonwealth

may offer into evidence the contraband and evidence found during the execution of the

---

   [6]  This Court is not aware of any incriminating statement made by any defendant
after the arrival of the search warrant.

18

search warrant, as well as any observations made by the officers during the execution of

that warrant.

Ralph D. Gants
Justice of the Superior Court

Dated: August 29, 2003

EXHIBIT 3

# Judge is asked to reconsider

Sunday, December 14, 2003

'Subterfuge' used in bust, says judge

Evidence is suppressed

By Gary V. Murray
T&G STAFF
gmurray@telegram.com

WORCESTER- A judge has ordered the suppression of evidence in a drug case in which he accused certain members of the Worcester Police Department vice squad of acting unlawfully and using "subterfuges" and "shortcuts that undermine the constitutional rights of all of us."

In a 25-page decision allowing a defense motion to suppress evidence, Superior Court Judge Peter W. Agnes Jr. wrote, "The tactics used by the police in this case should be of concern to a wider audience than those involved directly in this case."

The judge noted in his ruling that the responsibility for establishing strategies in the war on drugs lies with the Legislature and governor.

"However, as long as a priority is placed on the law enforcement approach to the eradication of the drug problem, every person in this Commonwealth has an interest in insuring that the police observe the limits imposed by our state and federal constitutions and laws. In this case, those limits were not observed," Judge Agnes wrote.

The suppression of statements and physical evidence, including quantities of marijuana, cocaine and heroin seized by police from a vehicle and apartment, came in the Worcester Superior Court case of Aaron T. Wade, 30, who is awaiting trial on a series of drug charges to which he has pleaded not guilty.

Mr. Wade's lawyer, Irwin Kwiat, sought the suppression in a motion in which he alleged that evidence was gathered in violation of his client's constitutional rights.

The facts of the case, as outlined in the judge's findings, were as follows:

On the morning of Sept. 16, members of the vice squad, under the direction of Sgt. Timothy O'Connor, were engaged in a drug investigation targeting Mr. Wade. Based on information provided by a confidential informant and drug purchases made by the unidentified individual, Sgt. O'Connor had obtained a search warrant for Mr. Wade's apartment at 15 Liberty St. and his 1995 green Ford Explorer.

Sgt. O'Connor took up a position in a lot at 85 Prospect St., which he also had described as a target of the investigation. He saw Mr. Wade exit 85 Prospect St. and get into a green Ford Explorer. Mr. Wade had begun to drive away when a woman, later identified as his girlfriend, Sarah Hebert, came out of 85 Prospect St., waved him down and handed him an item.

The two kissed. Mr. Wade drove off in the Ford Explorer and Ms. Hebert left in another vehicle.

Sgt. O'Connor testified during a hearing on the motion to suppress that he saw Ms. Hebert hand Mr. Wade a plastic baggie that she had retrieved from her vehicle. However, Judge Agnes found that Ms. Hebert handed Mr. Wade his driver's license, which he had left in her car.

Sgt. O'Connor informed other officers that there had been a suspicious exchange between the defendant and his girlfriend and gave instructions to arrest Mr. Wade, stop Ms. Hebert, search her vehicle and bring her to 15 Liberty St.

The judge found that Ms. Hebert was stopped a short time later by Officer Robert Lombardi, who was assisted by Officer Daniel O'Connor. Ms. Hebert, who was not charged, was ordered out of the vehicle and placed in handcuffs. The officers searched the car and its contents, including Ms. Hebert's handbag, the judge found.

Ms. Hebert was then taken in an unmarked police van to 15 Liberty St., where Officer Richard Sandberg had stopped Mr. Wade after he had parked his Explorer in a lot across from the Liberty Street address. Officer Sandberg told Mr. Wade that he was under arrest for selling crack cocaine. Judge Agnes found.

Sgt. O'Connor and other officers arrived and the sergeant showed Mr. Wade the warrants for 15 Liberty St. and the Ford Explorer. He advised Mr. Wade of his Miranda rights, but Mr. Wade was not

# Judge is asked to reconsider

asked whether he understood the rights and did not indicate he wished to speak with police, the judge found.

A search of the Explorer turned up plastic packets containing what were later determined to be marijuana and heroin, as well as about $300 in cash.

Mr. Wade was brought inside the apartment at 15 Liberty St., and at some point, Ms. Hebert also arrived there. Immediately upon her arrival, Officer James O'Rourke commented that the apartment, where no drugs were found, was where Mr. Wade "brings his hookers to smoke crack," the judge found.

It was at that point, Sgt. O'Connor said, that Mr. Wade asked to speak to police outside of Ms. Hebert's hearing, offered to cooperate and was again advised of his Miranda rights before signing a form consenting to a search of an apartment at 85 Prospect St. Marijuana, cocaine, heroin and $16,920 in cash were seized from the Prospect Street apartment.

Sgt. O'Connor said Mr. Wade never asked to speak to a lawyer.

In a footnote to the decision, Judge Agnes said he did not credit Sgt. O'Connor's testimony on those points or Officer O'Rourke's testimony that while inside 15 Liberty St., Mr. Wade said he was in possession or control of a large quantity of drugs.

Judge Agnes found, instead, that Sgt. O'Connor told Mr. Wade he intended to arrest Ms. Hebert and charge her with possession of the drugs found in the Explorer if he did not cooperate. When Mr. Wade asked to talk to a lawyer, Sgt. O'Connor told another officer to place Ms. Hebert under arrest, the judge found.

Mr. Wade then said he would cooperate if his girlfriend were not arrested, according to Judge Agnes' findings. The judge also found that no one read Mr. Wade the consent form before he signed it and that Mr. Wade "reads at a very low level and was not capable of reading and understanding the consent form without assistance."

Judge Agnes ruled that the warrants authorizing police to search Mr. Wade's Explorer and the apartment at 15 Liberty St. were invalid because they were not supported by probable cause. The judge said there was no information in the police affidavit in support of the warrants suggesting drugs were ever seen in Mr. Wade's vehicle or home.

He also found that the stop of Ms. Hebert's vehicle was unlawful, that Mr. Wade did not voluntarily consent to the search of 85 Prospect St. and that the entry and search there were illegal.

"Although they obtained search warrants, they resorted to shortcuts and subterfuges when those warrants did not produce the results they sought," Judge Agnes wrote in reference to the officers involved in the case.

"They detained Sarah Hebert and searched her vehicle without probable cause or reasonable suspicion of wrongdoing. They threatened to arrest Sarah Hebert, without justification, in an effort to induce the defendant to cooperate. They ignored the defendant's request for an attorney, and obtained his signature on a consent to search form even though he can barely read.

"While the defendant may indeed have been engaged in illegal activities in September, 2002, certain officers of the Worcester Police Department set out to make a case against him by using shortcuts that undermine the constitutional rights of all of us," Judge Agnes wrote.

He suggested police could have further developed the information they had in the case "by conducting surveillances and genuine controlled buys that would have either dispelled their suspicions or established an unassailable case of probable cause."

Judge Agnes concluded his ruling by quoting from a 1995 state Appeals Court decision: "The community that fails to insist on scrupulous observance of high standards by its police and prosecutors has lost track of its fundamental purposes, and courts that approve well-meaning but unconstitutional conduct by law enforcement officers, even in the case of undoubtedly guilty defendants, deal the administration of justice and the integrity of the legal process a greater blow than when they permit a particular criminal to delay, or sometimes even wholly to escape, due punishment by insisting on an untainted constitutionally correct trial."

Judge Agnes' ruling comes on the heels of two recent decisions by Superior Court Judge Ralph D. Gants in which he found that Sgt. O'Connor falsely testified in an effort to justify police actions in drug investigations. Sgt. O'Connor has maintained he testified truthfully in both instances.

Assistant District Attorney Christopher P. Hodgens filed a motion asking Judge Gants to reconsider his decision in one of the cases, describing the judge's finding that Sgt. O'Connor lied as "clearly

## Judge is asked to reconsider

erroneous" and subject to reversal on appeal. He asked the judge to reopen the hearing and allow the prosecution to present additional evidence.

Judge Gants denied the motion on procedural grounds, saying he lacked jurisdiction because a notice of appeal had been filed. District Attorney John J. Conte, citing case law, said the judge was in error when he determined that he lacked jurisdiction to address the motion to reconsider.

Mr. Conte said last week, he would ask the court for time to obtain and review a transcript of the hearing in Mr. Wade's case before deciding whether to appeal Judge Agnes' ruling.

Police Chief Gerald J. Vizzo voiced support for the vice unit.

He said the vice unit, as well as all other units and divisions in the Worcester Police Department, are currently under review with regard to policies, procedures and standards.

"I have only recently received a copy of Judge Agnes's decision which I will review with my command staff," he said. "If there are procedures or practices specific to the vice unit, i.e. affidavits, search warrants, Miranda rights, that need to be addressed or corrected whether through training or policy, they will be made. I want to reiterate I support the entire police vice unit and their work and reputation for integrity in conducting thorough and professional investigations."

Chris Echegaray of the Telegram & Gazette staff contributed to this report.

Tuesday, December 9, 2003

### Judge won't reconsider 'lie' finding

By Gary V. Murray

WORCESTER- A Superior Court judge said he lacks authority to reconsider his finding that a veteran vice squad officer lied under oath in an effort to justify police actions during a drug raid.

Assistant District Attorney Christopher P. Hodgens filed a motion last month in Worcester Superior Court asking Judge Ralph D. Gants to reconsider his Aug. 29 finding that Worcester Police Sgt. Timothy J. O'Connor falsely testified in an evidence suppression hearing. Mr. Hodgens described the finding as "clearly erroneous" and subject to reversal on appeal. He asked the judge to reopen the suppression hearing to enable prosecutors to present additional evidence.

Mr. Hodgens, the head of District Attorney John J. Conte's appeals unit, also filed a notice of appeal of Judge Gants' suppression of evidence in the case with the state Appeals Court.

### DENIAL

On Nov. 21, Judge Gants denied the prosecution's motion for reconsideration on procedural grounds.

"The simultaneous filing of these two motions effectively prevents this Court from ruling on the motion for reconsideration in the absence of a stay from the Appeals Court specifically authorizing such reconsideration," Judge Gants wrote. Judge Gants cited case law that he said supported his contention that he lacked jurisdiction to reconsider his earlier finding in light of the prosecution's notice of appeal.

"We'll have to rely upon the appeal," Mr. Conte said in reference to the denial of the motion for reconsideration.

In his Aug. 29 ruling on a motion to suppress evidence, Judge Gants said he did not believe Sgt. O'Connor when he testified that fellow officers entered a first-floor apartment at 138 Endicott St. on April 11, 2002, only after Isidro Arias, one of the occupants, said they could go in and look for drugs.

"After careful consideration, this court has come to the conclusion that Sgt. O'Connor intended to lie to the court by falsely fabricating consent to enter the apartment to avoid the legal difficulties of justifying the entry without consent," Judge Gants wrote.

### STATEMENTS

The judge suppressed as evidence statements that were overheard and observations that were made by police from the time of the entry until a warrant was later obtained to search the apartment. Judge Gants refused to suppress about 30 grams of heroin that police said they discovered during a search after the warrant was issued.

Sgt. O'Connor has said that he testified truthfully during the hearing on the motion to suppress. Accompanying the motion for reconsideration were affidavits from several police officers and others that, Mr. Hodgens said, tended to corroborate Sgt. O'Connor's testimony.

# Judge is asked to reconsider

Saturday, November 8, 2003

Judge is asked to reconsider

Evidence suppression rests on finding that officer lied

Gary V. Murray
T&G STAFF

WORCESTER-Prosecutors are asking a judge to reconsider his finding that a veteran vice squad officer lied under oath in an effort to justify police actions during a drug raid.

In a motion filed this week in Worcester Superior Court, Assistant District Attorney Christopher P. Hodgens described Judge Ralph D. Gants' Aug. 29 finding, that Worcester police Sgt. Timothy J. O'Connor falsely testified in an evidence suppression hearing, as "clearly erroneous" and subject to reversal on appeal.

Mr. Hodgens is asking Judge Gants to reconsider his finding regarding Sgt. O'Connor's testimony and his suppression of evidence in the case. His motion for reconsideration asks the court to reopen the suppression hearing to enable the prosecution to present additional evidence.

In his 19-page decision, Judge Gants said he did not believe Sgt. O'Connor when he testified that fellow officers entered a first-floor apartment at 138 Endicott St. only after Isidro Arias, who lived there, said they could go in and look for drugs.

"This court does not believe this testimony. After careful consideration, this court has come to the conclusion that Sgt. O'Connor intended to lie to the court by falsely fabricating consent to enter the apartment to avoid the legal difficulties of justifying the entry without consent," Judge Gants wrote.

He went on to find that Mr. Arias "did not consent to this initial entry," which was followed, more than an hour later, by a search warrant being issued and the discovery of about 30 grams of heroin and more than $3,000 in cash. Judge Gants found the warrant and search to be lawful.

The motion to suppress was filed by lawyers for Mr. Arias and his wife, Maximinia Altagracia, who were each charged with trafficking in heroin in connection with the April 11, 2002, raid.

Judge Gants ordered the suppression of any statements made by the couple, or observations made by police, from the time officers entered the apartment until the arrival of the search warrant. He refused to suppress evidence found or observations made during the use of the search warrant.

In his motion, Mr. Hodgens said reconsideration was warranted because the evidence suppressed by the judge, including a bottle of inositol, a cutting agent, "would have been inevitably discovered by officers searching the apartment with the search warrant."

Mr. Hodgens said reconsideration also was warranted because the record of the case did not support the judge's conclusion that Sgt. O'Connor lied.

While appellate courts generally accept a trial judge's credibility determinations, a judge "does not have the absolute discretion to label a witness a liar and perjurer," Mr. Hodgens wrote.

He went on to say that the "scant evidence reflecting on credibility in the present case shows that the trial court judge exceeded the bounds of that discretion.

"While he was not compelled to credit the commonwealth's evidence, the judge had no logical basis to conclude that Sgt. O'Connor lied under oath," the prosecutor said in his motion.

Accompanying the motion were several affidavits from fellow police officers and others that, Mr. Hodgens said, tended to corroborate Sgt. O'Connor's testimony.

The district attorney's office has also filed an appeal of the suppression order in the event Judge Gants denies the motion for reconsideration.

In a Sept. 8 ruling in an unrelated case, Judge Gants again found that Sgt. O'Connor provided false testimony during a defense motion to suppress evidence. The judge denied that motion.

District Attorney John J. Conte said yesterday a motion for reconsideration would not be filed in the latter case because his appeals unit believed the judge's findings in that case were contingent upon his findings in the first case.

Sgt. O'Connor, a 20-year police veteran, has said he testified truthfully on both occasions.

Find and buy toyota park.Official site of the 2009 Jeep wrangler.Visit Subaru of America for reviews, pricing and photos of impreza.2006 Nissan 350Z highlights from Consumer Guide Automotive. Learn about the 2006 nissan 350z.Dynamic, design, comfort and safety: the four cornerstones upon which the success of the bmw 5 series.Find and buy toyota center kennewick.Contact: View company contact information fo protege.What does this mean for legacy.The website of American suzuki motorcycle.The site for all new 2009 chevy.Use the Organic

# Judge is asked to reconsider

natural food stores.Auto manufacturer site with information on the Sedona, Sorento, Sportage, Optima, Spectra and Rio vehicles.kia.Get more online information on hyundai getz.Find and buy used nissan 350z.Kia cars, commercial vehicles, dealers, news and history in Australia. kia com.Site for Ford's cars and minivans, trucks, and SUVs. Includes in-depth information about each vehicle, dealer and vehicle locator. ...fords dealers.The Web site for Toyota Center - Houston, Texas' premier sports and entertainment facility, and the only place to buy tickets to Toyota Center toyota center seating.Facturing and invoice discounting solutions from Lloyds TSB commercial finance.Read Fodor's reviews to find the best travel destinations, hotels and restaurants. Plan your trip online with Fodor's travel guide.Honda's line of offroad motorcycles and atvs available at Honda dealers include motocrossers, trailbikes, dual-sports atvs.Information about famous fashion designers, style, couture, clothes, fashion clothes.Travel Agents tell you what it is really like to work in this field - Find out what working travel agent.Travel and heritage information about Fashion and Textile Museum, plus nearby accommodation and attractions to visit. Part of the Greater London Travel fashion.Get buying advice on the Mazda rx8 pretty skill

## pretty skill

when faced heart am present heavy

## heart am present heavy

which says as what would be

## as what would be

Typically lasers are decision making

## decision making

they guided specialized sub-branches

## specialized sub-branches

be back to normal soon Laser light is usually

## Laser light is usually

form sentence great one time but

## one time but

divided in several inhabited for at least two millennia

## inhabited for at least two millennia

very through just

FREE FRANK

DA John Conte

e-mail us at Worcestervoice@msn.com

8/7/2009